WILLIAM DURFEE, JUNIOR *vs.* DURFEE & CANNING, INC. & another.

Bristol.   December 5, 1947. — July 8, 1948.

Present: QUA, C.J., LUMMUS, DOLAN, WILKINS, & SPALDING, JJ.

*Corporation,* Officers and agents, Corporate entity.  *Fiduciary.*   *Trust,* Constructive trust.  *Profits.*

In a suit in equity brought for the benefit of a corporation by the owner of one half of its capital stock against the owner of the other half, who also was its treasurer, vice-president, and a director, a decree was ordered entered adjudging the defendant a constructive trustee of profit wrongly and secretly realized by another corporation which was the defendant's creature, where it appeared that the defendant, using the facilities and personnel of the first corporation while ostensibly operating in the name of his creature corporation, which lacked such facilities and personnel, caused his creature corporation to purchase a certain grade of gasoline, advantageous to the first corporation's business, from a seller who would have dealt directly with the first corporation, and to sell the gasoline to the first corporation at such profit to the creature corporation.

One who was treasurer, vice-president, and a director of a corporation and who wrongly realized a secret profit through a second corporation which was his creature by causing his creature corporation to buy gasoline and sell it to the first corporation at such profit, was not relieved of liability to the first corporation as constructive trustee of such profit by the mere facts that the first corporation was not financially able to purchase the gasoline and that he personally had financed the transactions.

In a suit in equity brought for the benefit of a corporation by the owner of one half of its capital stock against the owner of the other half, who also was its treasurer, vice-president, and a director, to charge the defendant as a constructive trustee of a profit wrongly gained through a second corporation, which was the defendant's creature, by means of sales of gasoline by the creature corporation to the first corporation at a mark-up, a finding by a master that the defendant had failed to prove by a fair preponderance of the evidence that the plaintiff "consented to, approved, ratified or acquiesced" in such sales with knowledge of all the material facts was not inconsistent with his findings that the plaintiff all along knew that the defendant's creature corporation was making sales to the first corporation and suspected that such sales

were at a mark-up, but that he did not know of the fact of the mark-up or its extent until after the period of the sales and a few months before the suit was commenced.

A master in a suit in equity, who had warrantably found a sum for which, if the court so ruled on his findings, the defendant would be chargeable as constructive trustee to a corporation, of which he was treasurer, vice-president, and a director, as for certain profits realized during a period of over two years through a corporation which was his creature by means of a mark-up on sales of gasoline by the creature corporation to the first corporation, rightly refused to use, in the absence of other evidence, as the measure of the mark-up during a further period of four months, the average mark-up of the previous period, where he found that similarity of conditions in the two periods had not been proved, although he also found that in the circumstances he would be warranted in drawing the most adverse inference possible against the defendant.

BILL IN EQUITY, filed in the Superior Court with a writ of summons and attachment dated August 3, 1944, and afterwards amended.

By order of *Cabot*, J., there were entered an interlocutory decree confirming a master's report, and a final decree dismissing the bill. The plaintiff appealed.

*J. P. Rooney*, (*J. C. Reilly* with him,) for the plaintiff.

*H. E. Foley*, (*C. I. Peterson & H. L. Berman* with him,) for the defendant Chester H. Canning.

DOLAN, J. This bill in equity is brought by the plaintiff, a stockholder, on behalf of Durfee & Canning, Inc., and all other stockholders thereof, to enforce in favor of the corporation certain liabilities of the defendant Chester H. Canning, since 1930 treasurer, vice-president, purchasing agent, a director and a stockholder of the corporation. Durfee & Canning, Inc., and the Pacific Gas Corporation are also named as defendants. [1]

The material allegations of the bill are that in breach of trust the defendant Canning, without disclosing to the directors of Durfee & Canning, Inc., his interest in the defendant Pacific Gas Corporation, or the profit that Pacific Gas Corporation, of which Canning was an officer, director and stockholder, was making from certain trans-

---

[1] Pacific Gas Corporation filed a plea to the jurisdiction of the court below on the ground that it was a foreign corporation not engaged in doing business in Massachusetts, and a final decree was entered by the judge dismissing the bill as against it without prejudice.

actions without the knowledge or consent of the directors of Durfee & Canning, Inc., caused the latter to purchase natural gasoline from Pacific Gas Corporation at prices in excess of market prices and in excess of the prices paid by that corporation in purchasing that gasoline from Warren Petroleum Corporation, and that these transactions were effected by Canning fraudulently and in bad faith and in violation of his duty of loyalty to Durfee & Canning, Inc. The relief sought by the bill is the recovery in behalf of Durfee & Canning, Inc., of the profits realized by Pacific Gas Corporation from these transactions, that is, the difference between the amount that corporation paid for the natural gasoline and that which it charged to Durfee & Canning, Inc.

The case was referred to a master, whose findings may be summarized as follows:[1] Durfee & Canning was organized under the laws of this Commonwealth in 1930 for the purpose of dealing in petroleum products, principally gasoline, kerosene and fuel oil. Prior to incorporation it was a partnership conducted by Durfee and Canning and when incorporated had assets of the value of about $100,000. Since that time it has been in effect a "two-man affair" with Durfee as its president, assistant treasurer and a director, and Canning as its treasurer, vice-president and a director. Throughout, one half of the capital stock of the corporation has been owned by each of them. They had equal powers and duties and there were no important spheres of corporate activity to which either confined himself to the exclusion of the other. On October 8, 1941, Canning organized the Island Transport Company, investing $40 which represented the subscription price of its entire capital stock consisting of four shares held by nominees for his benefit. He was president, treasurer and a director of that corporation and he selected the remaining directors. On June 24, 1942, he caused the name of that corporation to be changed to Pacific Gas Corporation. At

---

[1] In summing up the findings of the master the plaintiff will be referred to as Durfee; the defendant Canning as Canning; Durfee & Canning, Inc., as Durfee & Canning; the Pacific Gas Corporation as Pacific; and Warren Petroleum Company as Warren.

that time he transferred three of its four shares into his wife's name for her benefit and that of her daughter. He transferred the fourth share to Angela Cashen, an employee in his New York office, for the benefit of her brother James A. Cashen, Junior, hereinafter referred to as Cashen, through whose services and influence with Warren the Pacific-Warren transactions were negotiated. The only consideration for the transfer of the fourth share was the services that Cashen had rendered and was expected to render as Canning's consultant and contact with Warren. Canning continued to hold the same offices in Pacific as he had held in Island Transport Company, and "installed" his wife and his attorney as the remaining directors. They are "'dummy' directors." Mrs. Canning and her daughter have never been consulted about the conduct of the business of Pacific. Canning's attorney has been doing legal work for Pacific but has exercised no independent judgment as a director. Cashen's only financial return from Pacific has been to collect compensation from it for effecting sales of natural gasoline to it by Warren. During the period with which we are here concerned Canning "alone determined its [Pacific's] policies and actively managed and directed its business."

"Prior to June, 1942, Durfee & Canning . . . was a relatively small enterprise. . . . By 1942, its business and organization had grown and expanded considerably as compared with the situation existing at the time of its incorporation in 1930, and it had become an important local factor." For years Durfee & Canning had been dealing for the most part in "regular" grade gasoline. Until June, 1942, Durfee & Canning did not deal in natural gasoline. The product known as "14# natural gasoline" may be obtained as a residual product by a process of extracting certain high hydrocarbon ingredients from "26# natural gasoline." It was as a result of a war production board program encouraging this process that the industry first discovered the commercial possibilities of 14# natural gasoline as a blending agent with regular gasoline. Number 14 natural gasoline was new and imperfectly understood in

February, 1942, and its possibilities did not come to the attention of Canning until the spring of 1942.

"Faced with the problem created by the suspension of butane and propane sales [in which Canning began to deal early in 1942] and recognizing the utility of 14# natural gasoline as a volume substitute for regular gasoline, Canning became eager [in May, 1942] to engage in 14# natural gasoline dealings. He had in mind the fact that Pacific . . . lacked storage, terminal and transportation facilities and experienced, trained personnel for the efficient handling of this product, and . . . it is a fair inference from the evidence that Warren executives were also aware of this. Canning's only practical recourse was to use the facilities and personnel of Durfee & Canning . . . by selling the gasoline to it and having it undertake the distribution of the product for its own account." When he began to engage in the sale of butane and propane products in the early part of 1942 he took into his employ one Townsend who was one of the important executives of Durfee & Canning. He had been in its employ for many years, and was manager of its wholesale department and "key" man in sales production. Canning had great confidence in him, and when Canning suspended his operations in butane and propane he reckoned "on the use of Townsend as the liaison employee who would effectively integrate the Durfee & Canning . . . purchases from Pacific . . . with the Pacific . . . purchases from Warren. Throughout the period covered by this suit, Townsend continued in the employ of both Durfee & Canning . . . and Pacific . . . . All Pacific . . . sales of 14# natural gasoline were made by either Canning or Townsend, and all Townsend's activities in behalf of Durfee & Canning . . . and Pacific . . . in relation to the purchases and sales by the former and sales by the latter were under the supervision and direction of Canning. Townsend kept Canning fully informed of his activities and they met with his full approval. Durfee was not consulted by Canning or Townsend in connection with these dealings and played no part therein except as he signed checks in payment of Pacific . . . invoices." "Reasoning that it would be highly advantageous

for Durfee & Canning . . . to procure a large supply of 14#
natural gasoline for the purpose of blending it with regular
gasoline and thus offset the curtailment of its supply of
regular gasoline caused by war conditions, he [Canning]
envisioned great expansion in Durfee & Canning . . . oper-
ations with consequent profit to it.   His intention was to
obtain from Warren for Pacific . . . a large and continuous
supply of 14# natural gasoline and resell most of it to Dur-
fee & Canning . . . at a profit, and he reasoned that not
only would Durfee & Canning . . . have a plentiful supply
for its customary trade and for resale to large companies in
bulk at considerable profit, but Cashen and he would be
compensated for having developed a connection with War-
ren, which he regarded as a special privilege and opportunity
exclusive and personal to them.   Admitting that he made no
attempt at any time, then or thereafter, to get . . . War-
ren . . . to sell 14# natural gasoline directly to Durfee &,
Canning . . . he testified in explanation and justification
that he knew it was futile to approach Warren in behalf of
Durfee & Canning . . . for the reason that its credit stand-
ing was not strong and for the further reason that Warren
wanted to keep Pacific . . . active until such time as the
lifting of government restrictions would permit the resump-
tion of dealings in butane and propane.   It is a fact that
the credit standing of Durfee & Canning . . . in May,
1942, was too weak for large scale purchases on open ac-
count.   The situation in this regard, however, became in-
creasingly better sometime after July, 1942, but notwith-
standing marked improvement in Durfee & Canning . . .
finances, which Canning knew, he did not approach Warren
for the purpose of having it do business directly with Durfee
& Canning . . . .   Had Canning at any time so requested,
it is highly conjectural whether Warren would have been
willing to deal directly with Durfee & Canning . . . and
. . . [the master was] unable upon the evidence to find
that it would have agreed to supply Durfee & Canning . . .
with any large quantity of 14# natural gasoline."   The first
shipment by Warren to Durfee & Canning for the account
of Pacific was made on June 4, 1942, and shipments con-

tinued through that month. "It does not appear that Warren was aware that Pacific . . . had not in fact been incorporated." It was to "mend matters" that Canning proceeded by changing the name of the Island Transport Company to Pacific Gas Corporation, in the manner already set forth above.

In the period covered by this suit Pacific bought from Warren about sixty million gallons of natural gasoline of which it sold about forty-five million gallons to Durfee & Canning.[1] The orders from Pacific to Warren called for shipment f.o.b. Warren's shipping points. The resales to Durfee & Canning called for shipment f.o.b. these same shipping points, and listed Tiverton, Rhode Island (where Durfee & Canning had its terminal rail facilities), as the destination. The facilities of Pacific consisted of three small offices. By inference it appears that these purchases and sales by Pacific were accomplished by mere paper transactions. Based on certain subsidiary findings of fact which need not be repeated here, the master found that "virtually from the beginning Durfee knew that Canning was connected with Pacific . . . in an important way" and that he "was well aware that Pacific . . . was an instrumentality directed, governed and controlled by Canning." Durfee knew that Durfee & Canning was buying large quantities of natural gasoline from Pacific; however he was not aware until November, 1944, that these sales were being made at a mark-up, nor did he know, until May, 1945, shortly before the substitute bill was filed, the extent of the mark-up. The master found that Canning "failed to prove by a fair preponderance of the evidence that Durfee consented to, approved, ratified or acquiesced in the sales made by Pacific . . . to Durfee & Canning . . . with knowledge of all the material facts."

These dealings were carried on during the period from June 4, 1942, through March 31, 1945. The master found from the aggregate invoice prices paid Warren by Pacific

---

[1] We are not here concerned with the fifteen million gallons bought by Pacific and sold to companies other than Durfee & Canning since the complaint seeks only to reach the profits on the sales to Durfee & Canning.

and the aggregate invoice prices paid Pacific by Durfee & Canning that for the period from June 4, 1942, through October 31, 1944, the total mark-up by Pacific on these sales was $185,553.06. For the period from November 1, 1944, through March 31, 1945, the invoices paid to Pacific by Durfee & Canning were in evidence, but those paid to Warren by Pacific were not. Canning had been served with a subpoena to produce the records of Pacific. Though he had access to them he refused to produce them on the ground that "they were not under his personal control as distinguished from his official control." The plaintiff requested the master to arrive at the price spread by multiplying the number of gallons sold by Pacific to Durfee & Canning during this period by the average mark-up per gallon during the preceding period. By this method the aggregate price spread for this latter period (November 1, 1944, through March 31, 1945) would be $35,505.75. The master, though he stated that in the circumstances he could draw any permissible inference most adverse to Canning, found that, due to lack of satisfactory proof of similarity of conditions during these two periods, he would not be warranted in drawing this inference.

The ultimate conclusions of the master are these: "Solely upon the basis of the subsidiary findings above reported, I reach the following conclusions: 1. Pacific . . . is and has been managed, governed and controlled by . . . Canning. 2. . . . Canning transferred his capital stock in Pacific . . . to his wife and daughter by way of gift. In my judgment, it is a question of law for the court to decide whether under the circumstances of the case his activity in the affairs of Pacific . . . can be said to carry the same legal consequences as if he had continued to retain his beneficial interest in the capital stock. 3. . . . Canning caused Pacific . . . in the period from June 4, 1942, through October 31, 1944, to purchase from Warren . . . 37,664,283 gallons of natural gasoline for the purpose of resale to Durfee & Canning . . . at a profit; and carrying out this purpose he, as an officer and director of Durfee & Canning . . . caused Durfee & Canning . . . to purchase the product from

Pacific . . . at prices which in the aggregate were $185,-553.06 in excess of the prices paid by Pacific . . . to Warren . . .. In my judgment, it is not a question of fact for me to find but one of law for the court to decide whether this conduct on the part of . . . Canning amounted to a breach of his duty of loyalty to Durfee & Canning . . .. 4. If said conduct was a breach of his duty of loyalty to Durfee & Canning . . . Canning is answerable to Durfee & Canning . . . in the sum of $185,553.06. Due to difficulty in computation presented by the evidence, counsel for the . . . [plaintiff] has waived interest through October 31, 1944."[1]

The plaintiff and the defendant filed objections to the report of the master in connection with which he summarized pertinent evidence. The defendant filed a motion to recommit which was denied. After hearing the judge entered an interlocutory decree overruling the exceptions to and confirming the report, and a final decree dismissing the bill, and the plaintiff appealed from these decrees.

The plaintiff's contentions are (1) that the defendant had a duty of loyalty to Durfee & Canning with respect to the transactions in question; (2) that the defendant's conduct amounted to a breach of his duty of loyalty to Durfee & Canning; (3) that the plaintiff did not ratify, acquiesce in or consent to the transactions with knowledge of all of the material facts, nor was he indifferent to them; and (4) that the plaintiff is entitled to recover, on behalf of Durfee & Canning, all of the profits retained in these transactions from June 4, 1942, to March 31, 1945. On the other hand, the defendant contends that on the facts found by the master it must be concluded that he committed no wrong in participating in the transactions in question because the gasoline was a product which Durfee & Canning could not have acquired directly and which the defendant neither could nor should have acquired for it, that Durfee & Canning was not able financially to purchase the product directly from

---

[1] From this point on Durfee will be referred to as the plaintiff and Canning as the defendant. We will continue to refer to Durfee & Canning, Inc., as Durfee & Canning, to Pacific Gas Corporation as Pacific, and to Warren Petroleum Corporation as Warren.

Warren, and that he, the defendant, was under no general duty not to buy or participate in the buying of the gasoline from Warren, since Durfee & Canning had no interest or expectancy in it and it was not essential to that corporation. The defendant further contends that the plaintiff had sufficient knowledge of all the material facts concerning the transactions in question and acquiesced in and ratified the same.

It is settled that the directors of a corporation stand in a fiduciary relationship toward the corporation and that out of this relationship arises a duty of reasonably protecting the interests of the corporation. *Lazenby* v. *Henderson*, 241 Mass. 177, 180–181. *Beaudette* v. *Graham*, 267 Mass. 7, 12. *Lincoln Stores, Inc.* v. *Grant*, 309 Mass. 417, 421, and cases cited. Their paramount duty is to the corporation, and their personal pecuniary interests are subordinate to that duty. *Beaudette* v. *Graham*, 267 Mass. 7, 12, and cases cited. And where suit is brought by a stockholder in a representative capacity to vindicate the rights of the corporation for wrongs committed by corporate officers, it is the corporation alone whose interests are immediately concerned. *Hayden* v. *Perfection Cooler Co.* 227 Mass. 589, 591. It is also settled that a director, who fraudulently or in violation of his fiduciary relationship diverts profits from the corporation, is personally liable though the profits are acquired by an agency controlled by the director or a third party; that the third party may also be liable; and that, even though the third party in the particular circumstances may not be liable, the director remains liable. *Emmons* v. *Alvord*, 177 Mass. 466, 470. *American Agricultural Chemical Co. of Massachusetts* v. *Robertson*, 273 Mass. 66, 85. In the instant case the question is whether the defendant by acquiring the natural gasoline from Warren for resale to Durfee & Canning at a profit has violated his duty to Durfee & Canning in behalf of which this suit is brought.

Varying rules or principles governing the determination of whether officers or directors of corporations have violated their fiduciary obligations in acquiring property or profits for their own personal gain have been laid down in judicial decisions in many jurisdictions. In some jurisdictions it

has been held that there is no breach of duty unless the subject property acquired is "property wherein the corpo-. ration has an interest already existing or in which it has an expectancy growing out of an existing right, or . . . where the officers' interference will in some degree balk the corporation in effecting the purposes of its creation." *Lagarde* v. *Anniston Lime & Stone Co.* 126 Ala. 496, 502. See *Zeckendorf* v. *Steinfeld,* 12 Ariz. 245; *Alger* v. *Brighter Days Mining Corp.* 63 Ariz. 135; *Carper* v. *Frost Oil Co.* 72 Colo. 345; *Pioneer Oil & Gas Co.* v. *Anderson,* 168 Miss. 334. In some of the cases just cited it has also been held that in order for the director of the corporation to be liable it must appear not only that the corporation was financially able to purchase the property but that the third person owning it would have dealt directly with the corporation. See also *Hannerty* v. *Standard Theater Co.* 109 Mo. 297; *Hauben* v. *Morris,* 255 App. Div. (N. Y.) 35. Other courts, however, in somewhat similar circumstances have found more readily that a conflict of interests exists. In *Lutherland, Inc.* v. *Dahlen,* 357 Pa. 143, 151, the court said, ". . . if there is presented to . . . [a director] a business opportunity which is within the scope of . . . [the corporation's] own activities and of present or potential advantage to it, the law will not permit him to seize the opportunity for himself; if he does so, the corporation may elect to claim all of the benefits of the transaction." In *Farwell* v. *Pyle-National Electric Headlight Co.* 289 Ill. 157, 164–167, the court stated, as the basis of a constructive trust of patent rights of which the corporation was the exclusive licensee and which had been purchased by the plaintiff, one of its directors, that by the purchase he had placed himself in a position in which his own personal interests would prevent him from acting for the best interests of the corporation. In stating that the same rule applies to directors as to all persons acting in a fiduciary capacity which requires the utmost fidelity to the interests of the cestuis que trust, the court, quoting from *Michoud* v. *Girod,* 4 How. 503, 555, said, "The general rule stands upon our great moral obligation to refrain from placing

ourselves in relations which ordinarily excite a conflict between self-interest and integrity." See *Gilman, Clinton & Springfield Railroad* v. *Kelly,* 77 Ill. 426. That of course is the fundamental principle which is the basis of our governing law. And in *Jasper* v. *Appalachian Gas Co.* 152 Ky. 68, 79, the court said that one in "a position of trust in the management and conduct of the affairs of a corporation . . . owes to said corporation the duty . . . of refraining from doing anything whatever that would injuriously affect said corporation, or deprive it of any profits which his skill and ability might properly bring to it, or enable it to make, in the fair and legitimate exercise of its powers." *Electronic Development Co.* v. *Robson,* 148 Neb. 526, 538.

It has also been held that, in order to constitute an interference with a corporate opportunity, the acquisition of the property must be not only within the corporate purpose but also highly desirable if not absolutely necessary to the furtherance of that purpose. *Golden Rod Mining Co.* v. *Bukvich,* 108 Mont. 569. *Carper* v. *Frost Oil Co.* 72 Colo. 345. *Colorado & Utah Coal Co.* v. *Harris,* 97 Colo. 309, 313.

In *Guth* v. *Loft, Inc.* 23 Del. Ch. 255, 270, the court held that determination of the issue of breach of duty should be made from a consideration of all the circumstances of the transactions, saying in discussing the universally accepted rule that corporate officers and directors are not permitted to use their position of trust and confidence to further their private interests, "The standard of loyalty is measured by no fixed scale. If an officer or director of a corporation, in violation of his duty as such, acquires gain or advantage for himself, the law charges the interest so acquired with a trust for the benefit of the corporation, at its election, while it denies to the betrayer all benefit and profit. The rule, inveterate and uncompromising in its rigidity, does not rest upon the narrow ground of injury or damage to the corporation resulting from a betrayal of confidence, but upon a broader foundation of a wise public policy that, for the purpose of removing all temptation, extinguishes all possibility of profit flowing from a breach of the confidence

imposed by the fiduciary relation.   Given the relation be-
tween the parties, a certain result follows;  and a construc-
tive trust is the remedial device through which precedence
of self is compelled to give way to the stern demands of
loyalty."   That of course is our settled law.

We do not concur in the argument of counsel for the
defendant to the effect that the test is whether the corpora-
tion has an existing interest or an expectancy thereof in the
property involved, being of the opinion that the true basis
of the governing doctrine rests fundamentally on the un-
fairness in the particular circumstances of a director, whose
relation to the corporation is fiduciary, "taking advantage
of an opportunity [for his personal profit] when the inter-
ests of the corporation justly call for protection.   This calls
for the application of ethical standards of what is fair and
equitable . . . [in] particular sets of facts."   Ballantine
on Corporations (Rev. ed. 1946) 204–205.   It is true that
in *Lincoln Stores, Inc.* v. *Grant*, 309 Mass. 417, the court
concluded that the plaintiff corporation had no interest or
expectancy in a business which had been acquired by cer-
tain directors of the plaintiff (a business in a city in which
the plaintiff had a store) and which after acquisition they
conducted in competition with the plaintiff, and held that
accordingly the directors violated no duty to the plaintiff.
But in that case the court was careful to point out that
the case was not one in which the stock of the business
purchased by the directors was acquired by them because
they had in mind that it was desirable or necessary for the
plaintiff's business, and that "No purpose . . . [was] dis-
closed to attempt to dispose of the stock to the company
at a profit" (page 422).   That case, therefore, is plainly
distinguishable from the present case where it is established
by the findings of the master that the defendant, having
in mind the fact that Pacific lacked necessary facilities and
trained personnel for the efficient handling of the product
and that his only recourse was to use the facilities and per-
sonnel of Durfee & Canning, and also believing that it
would be highly advantageous for Durfee & Canning to
procure a large supply of the natural gasoline, with conse-

quent expansion of its business and profit, used the facilities and personnel of Durfee & Canning while ostensibly operating in the name of Pacific which was exclusively controlled and dominated by him. It is thus established that he bought the natural gasoline in question to resell to Durfee & Canning and did so resell it, *Lincoln Stores, Inc.* v. *Grant,* 309 Mass. 417, 422, and that he exploited the opportunity to make a personal profit by the employment of the resources of Durfee & Canning. See *Solimine* v. *Hollander,* 128 N. J. Eq. 228, 246–247. The defendant's argument that the gasoline in question was not essential to the business of Durfee & Canning is without merit. As found by the master, the defendant expected that the transactions in question would be advantageous to the business of Durfee & Canning, and its business did make great progress in consequence. It is a fair inference that the defendant, who owned one half of its capital stock, thereby stood to profit through that interest. Durfee & Canning was entitled to have the defendant as a director use his best skill in forwarding the interests of that corporation, and to refrain from making the secret undisclosed profit in question at its expense.

The defendant has also argued that he was under no duty to purchase the gasoline for Durfee & Canning from Warren because the former could not have purchased it without the intervention of Pacific, the aid and assistance of Cashen, and the financial assistance of both Pacific and the defendant. As to this subject the master stated that it was highly conjectural whether Warren would have been willing to deal directly with Durfee & Canning, and that he was unable on the evidence to find that Warren would have agreed to supply it with any large quantity of 14# natural gasoline. We are of opinion that the proper conclusion as to this issue on the findings of the master is that the defendant through Cashen could have procured the gasoline directly for the account of Durfee & Canning, just as he procured the shipments to it by Warren, and that it is unreasonable to suppose that Warren would deal directly with Pacific, a corporation having $40 invested capital, dummy directors, and no

facilities for receiving, storing and marketing the product, and on the other hand would decline to deal directly with Durfee & Canning, in which the defendant owned one half of the capital stock and which had been in business for many years, and had when incorporated assets of the value of $100,000, and had the facilities that were essential to the defendant's transactions with Warren. The master has found that, had it not been for the willingness of Warren "at the instigation of Cashen and as a favor to Cashen and through him to Canning, to supply Pacific . . . with a large and continuous volume" of the gasoline over the period from June, 1942, through March, 1945, Pacific would have been able to purchase but a relatively small quantity thereof for delivery to Durfee & Canning for the account of Pacific, and that by the same token Durfee & Canning would have received but a small quantity thereof during the same period. In the light of these findings of the master and those concerning the relations of Cashen toward the defendant, to the effect that he was the brother of Angela Cashen, an employee in the New York office of the defendant, and that, while the defendant had transferred to her one of the four shares of Pacific for her brother's benefit, he had received no return from Pacific except payment for his services in procuring the gasoline from Warren, and of the further finding that Warren was favoring Cashen in the sales to Pacific, it is a fair inference that Cashen was working under the direction of the defendant in persuading Warren to sell to Pacific, and that the defendant, had he seen fit, could have procured the gasoline directly for the account of Durfee & Canning. Piercing the corporate veil the defendant was Pacific and Pacific was the defendant. Having bought the gasoline for resale to Durfee & Canning and having so resold it, he must account to it for the secret profit made by him during the period from June, 1942, through October 31, 1944. *Parker* v. *Nickerson,* 112 Mass. 195. *Lincoln Stores, Inc.* v. *Grant,* 309 Mass. 417, 422. *New York Trust Co.* v. *American Realty Co.* 244 N. Y. 209, 216–217. *Bliss Petroleum Co.* v. *McNally,* 254 Mich. 569, 573, and cases cited. *Solimine* v. *Hollander,* 128 N. J. Eq. 228, 246–247.

The defendant also argues that it is established by the master's report that Durfee & Canning was not financially able to purchase the gasoline in question, that Pacific raised money by borrowing on the defendant's guaranty and lent it to Durfee & Canning, and that in those circumstances he was not required to purchase the gasoline from Warren for Durfee & Canning. These circumstances did not relieve the defendant of his fiduciary obligation to Durfee & Canning. *Parker* v. *Nickerson,* 112 Mass. 195, 200. The defendant cannot be heard to contend that because of this aid he may retain the secret profit made in the sales to that corporation of the product which ostensibly he had bought for his creature Pacific, but in reality for resale to Durfee & Canning. In any event the argument that a fiduciary is not subject to the general rule here involved where the venture is one that the corporation itself is unable to take advantage of is not persuasive. *Irving Trust Co.* v. *Deutsch,* 73 Fed. (2d) 121, 124. As was said in that case, "If the directors are uncertain whether the corporation can make the necessary outlays, they need not embark it upon the venture; if they do, they may not substitute themselves for the corporation any place along the line and divert possible benefits into their own pockets." See also *Keokuk Northern Line Packet Co.* v. *Davidson,* 95 Mo. 467; *Red Top Cab Co.* v. *Hanchett,* 48 Fed. (2d) 236, 238.

We do not sustain the contention of the defendant that it must be found that the plaintiff acquiesced in and ratified the transactions in question. As to this subject matter the finding of the master that the defendant had failed to prove by a fair preponderance of the evidence that the plaintiff "consented to, approved, ratified or acquiesced" in the sales made by Pacific to Durfee & Canning with knowledge of all the material facts is not inconsistent with the findings of the master that the presumption is strong that the plaintiff all along suspected that Pacific was reselling the product to Durfee & Canning at a profit, that he entertained that suspicion from the beginning and, in substance, that that suspicion, "no matter how deeply rooted," did not rise to the level of "conviction" until November, 1944. The conclusion

reached by the master as to this subject is consistent with his findings that one of the material facts that the plaintiff was entitled to know with respect to the resales of the Warren product to Durfee & Canning was whether the resales were made at a mark-up; that an equally important fact that he was entitled to know was the extent of the mark-up; that the fact that there was a mark-up was not known to the plaintiff until November, 1944; and that the extent of the mark-up was not known to him until May, 1945, shortly before the substitute bill, now before us, was filed. The mere existence of a suspicion that there has been a breach of trust is not sufficient to constitute a confirmation. For "a cestui que trust to 'ratify' or confirm a breach of trust, he must be apprised of all the material facts and as well of their legal effect. No half-hearted disclosure or partial discovery is sufficient in either respect. The trustee's duty of disclosure is not discharged by leaving the cestui to draw doubtful inferences, conclusions and suspicions . . . ." *Earll* v. *Picken*, 113 Fed. (2d) 150, 158. *Ball* v. *Hopkins*, 268 Mass. 260. *Akin* v. *Warner*, 318 Mass. 669, 675. *Thompson* v. *Park Savings Bank*, 96 Fed. (2d) 544. *Cumberland Coal & Iron Co.* v. *Sherman*, 30 Barb. S. C. 553, 573–574. *Liquidators of the Imperial Mercantile Credit Association* v. *Coleman*, L. R. 6 H. L. 189. Scott on Trusts, § 216.3, and cases cited. In the instant case there was no disclosure by Canning of the profits he was deriving from the resale of the product to Durfee & Canning. In this connection his refusal to produce the books of Pacific at the hearing before the master is not without significance.

In all the circumstances disclosed by the report of the master we are of opinion that in the transactions involved the defendant was guilty of violation of his fiduciary obligations to Durfee & Canning, and that he cannot be allowed to retain for his own account the secret profits made by him at the expense of that corporation for the period from June 4, 1942, through October 31, 1944, to wit, the sum of $185,553.06. The master failed to compute interest on this amount from November 1, 1944, to the date of his report. That, however, may be provided for in the final decree to

be entered after rescript.  See *Young* v. *Winkley,* 191 Mass. 570, 575–576;  *Boyer* v. *Bowles,* 316 Mass. 90, 95.

In view of the result just reached the only exception of the plaintiff that need be considered is that taken to the refusal of the master to find that the defendant was accountable to Durfee & Canning for $35,505.75 as the profit made by him in the sale of natural gasoline by him to that corporation between November 1, 1944, and March 31, 1945, by using as the measure the average mark-up per gallon for the period from June 4, 1942, through October 31, 1944.   That figure could only be reached, if at all, by way of inference, since there was no evidence of the prices paid by Pacific to Warren during that period.   It was not possible to serve process on Pacific, a foreign corporation, to compel production of its pertinent records, and the defendant refused to produce them on the ground that they were not under his personal as distinguished from his official control.   That being so, the master correctly stated that he would be warranted in drawing the most adverse inference possible against the defendant, but found that such an inference did not supply the missing evidence of the prices paid by Pacific to Warren during the period under consideration, that the plaintiff "has failed to establish to . . . [his] satisfaction that conditions obtaining in the period from June 4, 1942, through October 31, 1944, were sufficiently similar to those prevailing in the period from November 1, 1944, through March 31, 1945, to warrant the use of the method requested by . . . [the plaintiff's] counsel," and further found on all the evidence that "there is no satisfactory proof of the price spread between what Pacific . . . paid Warren and what Pacific . . . charged Durfee & Canning . . . in the period" last mentioned.   As an element of the plaintiff's case he had the burden of proving by a fair preponderance of the evidence that profits were realized in that period by the defendant through Pacific in the resale transactions and what the profits were.  *Murphy* v. *Hanlon,* 322 Mass. 683, 686–687, and cases cited.   To recover, the profits in question must be capable of determination as a practical matter upon evidence that proves

them by a fair degree of certainty and accuracy; they cannot be recovered when remote, speculative, hypothetical and not within the realm of reasonable certainty. *Lowrie* v. *Castle*, 225 Mass. 37, 51. *Narragansett Amusement Co.* v. *Riverside Park Amusement Co.* 260 Mass. 265, 281. *Murray* v. *Bateman*, 315 Mass. 113, 115. We are of opinion that the method in question suggested by the plaintiff does not have sufficient basis in fact to warrant an inference as to the actual amount of mark-up during the later period in question. The findings of fact tend to the contrary, disclosing as they do that during the preceding period the mark-up per gallon was not constant, but decreased constantly.

The interlocutory decree entered by the judge overruling the exceptions to and confirming the master's report is affirmed. The final decree entered by the judge is reversed, and instead a final decree is to be entered adjudging that the defendant owes Durfee & Canning the sum of $185,553.06 and ordering the defendant to pay that sum to it with interest from November 1, 1944, to the date of the filing of the master's report, and with interest on that total sum to the date of entry of final decree after rescript, together with costs of this appeal.

*So ordered.*