FRED STRIFFLER, INC., *v*. GENERAL MOTORS CORPORATION.

SAME *v*. STRIFFLER.

1. MASTER AND SERVANT—AUTOMOBILE DEALERSHIP.
   Evidence presented in suit by automobile dealer's widow against manufacturer and successor in dealership who had been an employee of husband and herself *held*, to have shown that latter had fulfilled his duty of fidelity to trust reposed in him by cooperating with her while continuing her hopeless efforts to obtain a dealership and until she had abandoned all attempts to form such a relationship.

2. PRINCIPAL AND AGENT—AUTOMOBILE DEALERSHIP—EVIDENCE.
   Claimed agency on part of successor automobile dealer for plaintiff widow of automobile dealer in her efforts to obtain a new sales agreement with manufacturer *held*, under evidence presented, never to have existed.

3. SAME—AUTOMOBILE DEALERSHIP—DEATH—CANCELLATION OF CONTRACTS.
   Defendants who were not guilty of breach of trust as to plaintiff widow of automobile dealer, who was seeking to reestablish agency agreements that were cancelled after death of her husband, may not be said to have acted in violation of their duty of noninterference in matters involving material interests of their employer for their own personal benefit, where situation is such that plaintiff had no qualifications to function as a dealer and manufacturer never seriously considered a renewal with her and no serious efforts to obtain a successor dealership were made by individual defendants until after plaintiff's position became evident.

---

REFERENCES FOR POINTS IN HEADNOTES
[1, 3]  2 Am Jur, Agency §§ 252, 253.
[2]  2 Am Jur, Agency §§ 441 *et seq*.
[4]  12 Am Jur, Contracts § 375.

4. SAME—AUTOMOBILE DEALERSHIP—DEATH—PERSONAL CONTRACT.

 The award of successor dealership contracts by defendant manufacturer to defendant individual parties did not deprive plaintiff widow of automobile dealer of any property right, where contract relation between deceased and the manufacturer was basically one of personal service, was not inheritable, involved his own personal activity, and not any right or interest in property, was nonassignable, the manufacturer was not bound to recognize any nominee of plaintiff as successor to her husband and she had been rejected for sales agreements and no possibility existed that they would be available to her.

, Appeal from Wayne; Murphy (Thomas J.), J. Submitted June 7, 1955. (Docket Nos. 2, 3, Calendar Nos. 46,434, 46,435.) Decided December 1, 1955.

·' Bill by Fred Striffler, Incorporated, a Michigan corporation, against General Motors Corporation, a Delaware corporation, Wilsie-Kelly Chevrolet Company, a Michigan corporation, Frederick Sheldon Wilsie and Cecil M. Kelly to impress trust on dealers selling agreements, for accounting and other relief. Bill by same plaintiff against Delvin Striffler and General Motors Corporation for similar relief. Cases consolidated for trial and appeal. Bills dismissed. Plaintiff appeals. Affirmed.

· *Lucking, Van Auken & Schumann, Harry S. Toy* and *Marlin J. W. Campbell,* for plaintiff.

· *Henry M. Hogan* (*Daniel Boone* and *Louis H. Bridenstine,* of counsel), for defendant General Motors Corporation.

*John A. Hamilton,* for defendants Wilsie-Kelly Chevrolet Company, Wilsie, Kelly and Delvin Striffler.

REID, J. These 2 cases were consolidated on the hearing in the court below and on appeal to this

Court, but are 2 separate cases and require separate findings because not all the controlling facts are the same in each case, though many phases of each case depend upon certain facts which are common to both cases. From decrees for defendants, the plaintiff appeals.

At the conclusion of plaintiff's proofs, defendant General Motors Corporation moved for dismissal of the bills as to it. The motion was granted in one of the suits and denied as to the other. Defendant Cecil M. Kelly moved that plaintiff's bill be dismissed as to him, which motion was granted.

These suits are brought by Mrs. Helene Striffler, widow of Fred Striffler, deceased, as president of and in the name and for the benefit of a corporation, Fred Striffler, Inc., in which she owns a controlling interest. These 2 suits are actually brought principally for Mrs. Striffler's own benefit. It is plaintiff's theory that Frederick S. Wilsie (in the first suit) and Delvin Striffler (in the second suit) both were under obligation to plaintiff, Wilsie as confidential employee and Delvin Striffler as a specially-constituted agent. In the first suit, plaintiff claims that Wilsie was obligated to guard plaintiff's business interests, to cooperate in the management of plaintiff corporation's business, and especially to aid in procuring for plaintiff corporation a renewal of the sales agreement. Plaintiff claims that defendant Wilsie is liable for violation of the duties owed by Wilsie in that he procured a sales agreement of the Chevrolet by and for Wilsie-Kelly Chevrolet Company, and not for plaintiff.

In the other suit, plaintiff claims that defendant Delvin Striffler violated a trust relationship created by his agreeing to act with plaintiff in negotiating with General Motors to obtain a sales agreement, and that he procured for himself the agency sought by Mrs. Striffler for plaintiff with Delvin Striffler

to be a stockholder in or associated with plaintiff corporation. The defendants in the 2 suits are claimed by plaintiff to be separately liable in equity on plaintiff's demand for an accounting.

Plaintiff corporation had been formed by Mr. Fred Striffler in his lifetime and was in practical effect a one-man corporation. A majority of the stock was owned by him and apparently the rest of the stock was owned by his wife and 3 daughters.

Mr. Striffler had for many years been acting under successive sales agreements with General Motors Corporation in making sales of Chevrolet, Pontiac, Buick and Cadillac cars. During the period of about 1943 to 1945, he operated in a partnership under an arrangement with General Motors for sales at Caro, Michigan. During that period he was budget director of the State and absent much of the time in Lansing, and during that time many of the matters under the sales contract had been under the direct care and attention of Mr. Wilsie, who later formed the Wilsie-Kelly Chevrolet Company, defendant.

In 1947, Striffler returned from his duties at Lansing, to Caro, and the partnership in which he had acted as directive head of the sales agency was dissolved in 1947, but deceased continued the sales business under various sales agreements. About March, 1948, the plaintiff corporation was formed. The agreements were personal with Striffler, non-assignable, and expressly made subject to cancellation in case of his death.

Fred Striffler died July 15, 1948. Mrs. Helene Striffler testified:

"I first tried to see if I couldn't operate myself. I was told that I would not be able to. I first tried to see if I couldn't handle it myself. I was hopeful. Then I found that I couldn't operate as a responsible party on an agreement myself. I believe

Mr. Stuart told me that. It would be very difficult for me to remember the exact date. It was shortly after Mr. Striffler's death, so that shortly after Mr. Striffler's death, which was on July 15, 1948, I knew that I couldn't carry on as the person in paragraph third, I guess that is what they call it. * * * First of all I tried to interest someone to buy in the business outright. I had a talk with a man by the name of Beulin up at Cass City. And I had a talk with Mr. Summerfield's son-in-law. There was nobody else that I had a talk with before I approached Mr. Wilsie, only the mention I made to Mr. Auten [the banker] * * * in an offhand way."

August 5, 1948, Mr. Stuart, who had supervision for Chevrolet division of General Motors of dealership contracts in the territory in which Caro was situated, reported to his superior a recommendation that "we terminate this dealership immediately *for there is no one in the dealership capable of managing the business."* (Italics supplied.)

Mr. Garber, distributor, who had charge of Buick agencies in the territory in question, testified:

"I only told her the same thing, that we weren't interested in making a contract with her to continue in the business because it was not a business for a lady, and I had a long visit about the business, the used cars and all the things that go to make up our business, and that it is not the type of business for her, and I knew her very well, and I thought I was trying to do her a favor to get her out of the business."

Mr. Chapman, assistant general sales manager of Pontiac division of General Motors, testified:

"*The Court:* What conversation did you have with her when you went out there on October 1 [1948]?

"*A.* Well, I discussed the operations of our dealership, Judge, on the basis that we felt that at all times

in cases of a widow like this involved in an automobile dealership, through our experience, many times that a widow was much better off to get out of the business and turn it over to somebody else so she, in turn, could do exactly what she felt best for the assets that were converted into cash for her.

"*The Court:* What did she say?

"*A.* She agreed with me, Judge.

"*The Court:* What did she say?

"*A.* She said, 'I think you are absolutely right,' and she very agreeably signed.

"*The Court:* You told her it was your experience that you didn't want to carry along with a widow?

"*A.* I know in my own case, and personal friends in the automobile business, have already instructed their families that any time they pass on, to immediately get out of the business.

"First of all, it wasn't a woman's business to be in.

"*The Court:* You say you talked to her about it?

"*A.* Yes, sir, we did. We had a very enjoyable visit with Mrs. Striffler. She was quite agreeable.

"*The Court:* There was no conversation about her being able to continue if she got somebody?

"*A.* No, Judge, not in October. The time when she gave me the cancellation."

Mr. Stuart testified that all applications for the dealership came to his attention and that up to August 31, 1948, the date he left General Motors to take a dealership in Warren, Ohio, no application to his knowledge had been received from Wilsie. The letters of recommendation for Wilsie are dated September 28, 1948 and September 29, 1948. Wilsie was not recommended to Keating of the central office of General Motors until October 5, 1948 (exhibit No 53).

August 17, 1948, Chevrolet division of General Motors terminated its sales agreement with plaintiff corporation. Because of the terms of the contract, it was not renewable in the strict sense of that word.

In August, 1948, an interview occurred between Mr. Stuart and Mrs. Striffler. Mr. Stuart testified:

"I pointed out to Mrs. Striffler that our thinking was exactly the same as it was when we had, when I had previously talked with her on August 20th, namely we wanted a new dealer, that we wanted a new building, that we wanted to divorce ourselves from Pontiac, by reason of the fact that the Pontiac was so close to the price range of Chevrolet, and that that probably meant we would be divorcing ourselves from Buick, too, and that even though those were not our desires and intentions, we could not recommend Mr. Wilsie for manager of the dealership up there by reason of the fact that her husband in talking about incorporating the business possibly 9 months before had specifically told me that he had lots of respect and lots of respect for Mr. Wilsie's selling ability, but he did not have confidence in him from a managerial standpoint, and from that standpoint, if Mr. Striffler, who had worked with Mr. Wilsie for a period of some 20 years, if he felt that way, and we had a lot of respect for his judgment, if he felt that way, then certainly I, who knew very little about Mr. Wilsie, could not recommend him.   *   *   *   I did not state to her either directly or indirectly that I would think her proposition over. I couldn't have said that because I had also told her I was taking a dealership in Warren, Ohio, on September 30th."

Mrs. Striffler testified that on her request Wilsie agreed to manage the business of plaintiff corporation at a meeting of the corporation held July 24, 1948, and that Mr. Wilsie actually did conduct the management of the business from that time on, until the business was practically closed by sales to defendants of parts, accessories, et cetera, November 1, 1948.

Mrs. Striffler in her testimony would make out that she was continuing negotiations for an exten-

sion of the sales agreement for plaintiff practically until October. However, in that connection we note the testimony of Mr. Stuart heretofore quoted.

During the fall of 1948 Mrs. Striffler for the plaintiff corporation signed certain documents, exhibits offered and received in evidence, by which she surrendered to defendant Wilsie-Kelly company the business conducted under the Chevrolet sales agreement, and surrendered to the owner, the lease of the premises where the business had up to that time been conducted. Plaintiff sold the parts to the successors in business and knew of the construction of the new $109,000 building that was put up by the Wilsie-Kelly company.

Mrs. Striffler's excuse for not asserting the rights she now asserts in the instant suit for approximately 3 years is that she did not know her legal rights. However, in selling the parts and making other deals by which the business of the plaintiff was practically closed up in the fall of 1948, she consulted with Hon. Timothy C. Quinn, a competent attorney who rendered conscientious advice and who afterward became a circuit judge. He testified:

"*Q.* Now, Mrs. Striffler on the stand here has testified that you told her after the concellation of the Chevrolet agreement, 'You have been cancelled out, and nothing can be done about it.' Is that your recollection of what you told her at that time?

"*A.* That was the effect of it."

In a letter (to a third party) dated December 13, 1948, Mrs. Striffler states:

"In August when it became evident that I was not going to be able to continue the business, Mr. Wilsie wanted me to help him get the franchise."

Mrs. Striffler testified on cross-examination by Mr. Hamilton (attorney for several defendants):

"Now, during the years, the rest of 1948, 1949, 1950, 1951 and 1952 until I moved here in 1952—during all that time I never made any protest to Mr. Sheldon Wilsie or the Wilsie-Kelly Corporation, or to Mr. Delvin Striffler, to any of them, to the effect that I had been defrauded in connection with this deal, in any way, shape or manner."

Defendants in each case claim laches for nonassertion of plaintiff's rights for 3 years.

Mrs. Striffler never undertook any management of the business even during all her husband's serious illness, and never showed any personal qualifications for a dealership or any reason why the plaintiff corporation should be accorded an extension or renewal of the sales agreement with herself as the majority stockholder and therefore the directing power in the plaintiff corporation.

It is to be noted that Mr. Stuart, as local zone manager for Chevrolet division of General Motors, wrote a letter to his superior dated August 27, 1948, which letter Mrs. Striffler in her testimony acknowledged in general to be correct. In the letter, exhibit No 7, Mr. Stuart stated:

"Mrs. Striffler will undoubtedly approach anyone whom we select with an appeal to retain a part interest in the new dealership, but I am convinced that she is reconciled to the fact she cannot secure same."

The testimony in this case taken in its entirety is highly convincing that the officers of General Motors who had charge of the sales agreement matters of General Motors at Caro, did not regard Mrs. Striffler as fitted to be trusted as a controlling party under a sales agreement to sell the products of General Motors. The whole matter considered, it would have been surprising if it had proven to be the case that General Motors had actually contemplated at any

time that she ought so to be entrusted or was capable of carrying on or controlling the activities under any sales agreement.

Mrs. Striffler testified:

"Prior to the death of my husband, I had not taken any part in the business management of this business of selling cars in Caro. Prior to my husband's death, I had had no business experience."

Mrs. Striffler makes no showing that she possessed even moderate qualifications to be a local sales manager for a General Motors dealership.

Mrs. Striffler never had a chance to get the sales contracts renewed, either for herself or for the plaintiff corporation, in which she had a controlling interest. It is evident that General Motors never seriously considered a renewal with plaintiff.

The trial court construed the sales agreement with plaintiff corporation as in practical effect a personal agreement with Fred Striffler, now deceased. The trial court found:

"The only thing that she [Mrs. Striffler] could complain of is that Mr. Wilsie did not tell her that he was seeking the agency after it became evident that she could not have it."

Mrs. Striffler wrote the following letter, exhibit No 23, dated October 1, 1948, to Pontiac division, General Motors:

"*Gentlemen:* .

"Please take notice that I—we elect to and do hereby terminate my—our current selling agreement entered into with you, and request that you waive the required 30-days' notice of such termination so that the same will become effective upon receipt of this notice by you.

"Yours very truly,
"Fred Striffler, Inc.,
"By Helene J. Striffler,
"President."

August 10, 1948, is the date of Wilsie's application for an agreement with General Motors which he did not then file with General Motors, but which was filed some time later in September or in October. In the interim, he was cooperating with the efforts of Mrs. Striffler to obtain a renewal for plaintiff corporation of the sales agreement, and only took active means to obtain the sales agreement for himself after Mrs. Striffler and plaintiff corporation were both completely out of the picture.

Wilsie fulfilled his duty of fidelity to trust reposed in him, by cooperating with Mrs. Striffler while she continued in her hopeless efforts and until she had abandoned all efforts at obtaining the Chevrolet agreement.

After defendant Wilsie found that plaintiff corporation and Mrs. Striffler had no chance to get the renewal, he applied about October 1, 1948 for and obtained the sales agreement for himself and his brother-in-law defendant Cecil M. Kelly. From the date of his application, his employment at the plaintiff corporation was solely for the purpose of temporarily carrying on the sales and repair business, until it could be closed out, which occurred on or about November 1, 1948.

In the Delvin Striffler case, plaintiff claims that Delvin Striffler accepted from plaintiff an agency to assist Mrs. Striffler acting for plaintiff in negotiations with General Motors for the Pontiac and Buick sales agreements and that Delvin Striffler did not disclose to Mrs. Striffler his own antagonistic interests. Plaintiff claims that Delvin Striffler was precluded by the agency for plaintiff from acquiring these dealerships for himself.

Defendant Delvin Striffler in his testimony clearly states that in his conversation with Mrs. Helene Striffler, which was about October 24 or 25, 1948, he, Delvin Striffler, having in mind his own desires

and intentions and plans of procuring a sales agreement for himself, did not state to Mrs. Helene Striffler that he would accept an agency from plaintiff nor bind himself to accept an agency to procure for plaintiff together with him, such sales agreement. He merely told her that he would talk the matter over with Mr. Garber, the distributor of General Motors in charge of such sales agreements for the Buick division. Mrs. Helene Striffler having been in August, 1948, definitely turned down by the different officers having charge of the sales agreements for sales of Chevrolet, Buick, Pontiac and Cadillac cars, which her deceased husband had operated together, it is altogether unlikely that Delvin Striffler would obligate himself in any way to Mrs. Helene Striffler to act in plaintiff's interests rather than in his own in the ensuing October. Mrs. Striffler had sought him out as a prospective partner with herself in plaintiff's business and he never informed her at all that he would consent to be such partner. The agency (on Delvin Striffler's part) claimed by Mrs. Helene Striffler never existed. Mrs. Helene Striffler never complained to Mr. Garber about his giving the sales agreement of the Buick and Pontiac cars to Delvin Striffler.

To sustain its theory as to the accountability of the defendants in these 2 cases, plaintiff cites numerous authorities for the principle of law that an employee owes to the employer the duty of noninterference in matters involving material interests of the employer, and that the employee owes the duty of noninterference for his own personal benefit. These cases are not applicable to the present case, for as we have seen, the defendants in neither case were guilty of breach of trust.

Furthermore, the cases relied upon by plaintiff in this particular have to do with a duty of the employee respecting his employer's interests and

rights in property, real or personal or both. In contrast therewith, the sales agreement, a "renewal" of which was sought by plaintiff, is to be characterized as follows:

A. The sales agreement was personal with deceased, and based on his personal activity.

B. It was not a right that could be inherited.

C. The actual consideration coming from plaintiff corporation was deceased Striffler's own personal work, not any right or interest in property, personal or real.

D. The agreement was nonassignable.

E. General Motors was not bound to recognize any nominee of plaintiff or Mrs. Striffler, as successor to deceased.

F. Both Mrs. Striffler personally and plaintiff corporation had been rejected by General Motors prior to application by Wilsie or Delvin Striffler for sales agreements for themselves, and both Mrs. Striffler and the corporation were without any enforceable right to complain of their rejection.

G. Wilsie could not injure his employer in obtaining the distributorship unless a possibility existed that it be available to his employer.

We cite from the opinion of the trial judge the following which we deem to be a fair statement of the law respecting a contract such as that under consideration:

"None of the cases cited by counsel for the plaintiff involved a personal service contract. The only such case is cited by counsel for General Motors (*Davis* v. *Pearce* [CCA], 30 F2d 85, 89). In that case the court said:

" 'It has already been noted that the real character of the contract was for personal services of Davis and Pearce. These services were to be performed in the managerial capacity of overseeing sales of real estate. Whether an expectancy of renewal which has often been held to exist in connection with

leases of real estate can be said to exist in cases of contracts for personal services may not be free from doubt. But, conceding that the expectancy did exist when the contract was made and while it was being performed, it would naturally cease to exist when one of the parties died whose personal services were contracted for. And the expectancy of renewal would certainly cease to exist after renewal had positively been refused. *At the time when the new contract was made with the new corporation, the Security Realty Company had neither the right of renewal, the expectancy of renewal, nor the possibility of renewal.'* "    (Italics supplied.)

Plaintiff cites *Durfee* v. *Durfee & Canning, Inc.,* 323 Mass 187 (80 NE2d 522). However, we note in that opinion the following (p 199) : "The true basis of the governing doctrine rests fundamentally on the unfairness in the particular circumstances of a director, whose relation to the corporation is fiduciary, 'taking advantage of an opportunity (for his personal profit) *when the interests of the corporation justly call for protection.'* "    (Italics supplied.)

No protection could have assisted Mrs. Striffler in obtaining for herself or for her corporation any benefit of a renewal. Any so-called renewal would not be a renewal in fact; it would in practical effect be a new contract.

The decree appealed from in each case is affirmed. Costs to defendants.

Carr, C. J., and Sharpe, Boyles, Dethmers, and Kelly, JJ., concurred with Reid, J.

Smith, J., concurred in the result.

Butzel, J., did not sit.