**In re Myron SNYDER, Debtor.**

**Peter BAKIS, Sidney Bornstein, Richard Gilman, Philip Pearl and Newbury Prime Realty Corp., Plaintiffs,**

v.

**Myron SNYDER, Defendant.**

**Bankruptcy No. 84–01470–L.
Adv. No. 85–0001.**

United States Bankruptcy Court,
D. Massachusetts.

June 8, 1989.

Richard D. Gilman, Malden, Mass., for plaintiffs.

Myron Snyder, Brookline, Mass., pro se.

### MEMORANDUM

JAMES N. GABRIEL, Chief Judge.

### I. INTRODUCTION

The above captioned adversary proceeding was filed on January 2, 1985. The original complaint seeks a determination that certain debts owed by Myron Snyder ("Snyder" or the "Debtor") to the plaintiffs are nondischargeable pursuant to sections 523(a)(2)(A) and 523(a)(4) of the Bankruptcy Code. The complaint is predicated upon a complicated series of events, including the 1978 bankruptcy of the Paul G. Roberts Realty Trust; a bankruptcy court authorized sale of that estate's interest in real estate on Newbury Street in Boston; questionable activities related to the bankruptcy proceedings involving the Debtor and his wife, who were trustees of the Paul G. Roberts Realty Trust; and a state court lawsuit commenced by the law firm of Widett and Widett against, among others, the Debtor, his wife and the plaintiffs in this proceeding.

The complaint filed in this adversary proceeding was amended to add additional defendants and *inter alia* to obtain relief under section 727(a) of the Bankruptcy Code.[1] In July of 1986, the bankruptcy court per Judge Lavien, acting on the plaintiffs' motion for summary judgment, denied the Debtor his discharge pursuant to 11 U.S.C. § 727(a)(4)(A) and (B). The judgment was appealed first to the district court and then to the United States Court of Appeals for the First Circuit. The court of appeals reversed the district court, which had affirmed the bankruptcy court's entry of summary judgment in favor of the plaintiffs. On March 22, 1988, the district court remanded the matter to the bankruptcy court for further proceedings.

Approximately one year later, following Judge Lavien's decision to recuse himself from handling this adversary proceeding, and the issuance of numerous procedural orders by this Court, the issues in this case finally were narrowed and simplified. On March 8, 1989, the Court conducted an evidentiary hearing solely on the issue of whether certain debts owed by Myron Snyder to the plaintiffs are nondischargeble.

At the trial, two witnesses testified, the Debtor and Sidney Bornstein, and numer-

---

1. Although the original complaint seeks denial of the Debtor's right to a discharge, it contains no reference to section 727(a). The original and the amended complaints are not models of clarity, as both complaints fail to organize the relief requested in specifically enumerated counts.

ous exhibits were introduced into evidence, including a decision rendered on November 3, 1982 by Judge Randall of the Suffolk Superior Court, a decision rendered on August 15, 1984 by the Massachusetts Supreme Judicial Court, and a decision rendered on remand from the Supreme Judicial Court by Judge Randall on August 26, 1985. These decisions are important in view of their bearing on the issues in the case and the entry of an order by the bankruptcy court per the late Chief Judge Lawless on December 18, 1984 in response to a Motion for Relief from Stay and for Abstention Pursuant to 28 U.S.C. § 1334 filed by one of the plaintiffs in the Superior Court proceeding. That order provides in relevant part:

ORDERED that this Court shall abstain from hearing and determining any and all matters related to Case No. 57964 which is being heard by Judge William J. Randall of the Suffolk Superior Court, whether filed by Widett & Widett, et al., or any other counsel, and relief is immediately granted herein to allow any party related to said cause of action the right to proceed with motions, hearings, and any other Court proceedings before Judge Randall for the purpose of reducing any and all disputes therein to judgment.

It was Judge Lawless' clear intention to permit Judge Randall to enter judgments on the disputed matters pending before him. However, it is equally clear that Judge Lawless could not have made any decision with respect to the nondischargeability of any judgments obtained by the plaintiffs against the Debtor in the state court proceeding. Because this Court has been provided with Judge Randall's detailed findings and because there is a sufficient record from the hearings in the state court and in the bankruptcy court itself upon which the Court can make an independent assessment of whether the judgments obtained by the plaintiffs in the state court are or are not dischargeable in this bankruptcy proceeding, the Court may properly conclude this protracted proceeding by making the following findings and rulings.

It is important to stress at this juncture, however, that both the plaintiffs and the Debtor in this proceeding have sought the admission into evidence of Judge Randall's decisions. Accordingly, the Court will rely, at least in part, upon the facts found by Judge Randall in an initial proceeding that consumed 11 days of trial and involved the testimony of 18 witnesses and the introduction of 94 exhibits, and a subsequent proceeding that consumed four days of trial and involved the testimony of four witnesses and the admission into evidence of 27 exhibits. As will become clear, the debts that the plaintiffs now allege are nondischargeable were determined by Judge Randall to be due and owing by the Debtor after an exhaustive examination of the facts and the law. Although the original complaint does not enumerate them, the plaintiffs seek to have the following debts declared to be nondischargeable:

1. A judgment in favor of Sidney Bornstein in the amount of $60,100;

2. A judgment in favor of Sidney Bornstein in the amount of $2,300;

3. A judgment in favor of Philip Pearl in the amount of $600;

4. A judgment in favor of Peter Bakis in the amount of $1,800;

5. A judgment in favor of Newbury Prime Realty Corporation in the amount of $13,398.45, representing the fees and expenses of Attorney Richard Gilman;

6. A judgment in favor of Newbury Prime Realty Corporation in the amount of $232.71 plus interest from July 2, 1981, representing interest on a check found by Judge Randall to have been converted by the Debtor.

In view of the emphasis all parties have placed upon the state court proceedings, the Court does not view the plaintiff's failure to enumerate these debts as prejudicial to the Debtor in any way.

## II. STATE COURT PROCEEDINGS

A. Judge Randall's Decision of November 3, 1982

1. Background

The state court proceeding was commenced by the law firm of Widett & Wid-

ett, which had been promised a third mortgage on the Debtor's residence located at 156 Dead Road, Brookline, Massachusetts, as security for the Debtor's substantial obligations to the firm. The firm sued the Debtor; the Debtor's wife, Inez Tedesco Snyder; the Debtor's son, Robert G. Snyder; G. Ropate Corp., a corporation organized by the Debtor to engage in the meat brokerage business; Newbury Prime Realty Corporation ("Newbury Prime"), a corporation organized for the purpose of operating property on Newbury Street purchased at a bankruptcy sale of assets of the Paul G. Roberts Realty Trust; and four individuals who are or were directors of Newbury Prime, namely Sidney Bornstein ("Bornstein"), Gerald Bornstein, Philip Pearl ("Pearl") and Peter Bakis ("Bakis"). The law firm sought two forms of relief: (i) a judgment against the Debtor in the amount of the principal and interest owed it on a promissory note, and (ii) a declaration that a third mortgage to Harbor National Bank on property owned by the Debtor and his wife (property that secured the debt of G. Ropate Corp. and the guarantees of the Debtor and his wife of that debt) was null and void. Newbury Prime, Sidney and Gerald Bornstein, Pearl and Bakis filed an answer in which they asserted that the Widett firm's complaint failed to set forth a cause of action against them. They also asserted cross claims against Myron and Inez Snyder.

As summarized by Judge Randall, Sidney Bornstein alleged:

> 1) that Myron Snyder and Inez T. Snyder by fraud and deception prevailed upon him to assign for Newbury Prime the mortgage from Myron and Inez T. Snyder to Harbor that the Snyders had had assigned to Newbury Prime without giving him a full and complete understanding of the assignment and that as a result he became involved in this action in which he has had to expend much time and money; 2) that Myron Snyder was a director of Newbury Prime and as such owed a fiduciary duty to the officers, stockholders, and directors of Newbury Prime and that he breached this duty in the matter of the assignment of the

mortgage as set forth above; ... [and] ... 3) that Myron Snyder received the sum of $60,100 from Sidney Bornstein and has refused to repay the same to thesaid [sic] Sidney....

*Widett & Widett v. Snyder*, No. 5764, slip op. at 2–3 (Suffolk Superior Court November 3, 1982) (hereinafter "Decision of November 3, 1982").

Gerald Bornstein, Pearl and Bakis made similar allegations. Again, according to Judge Randall, they asserted:

> 1) that defendants [sic] Snyder without the knowledge or assent of Bornstein, Pearl and Backis [sic] devised a plan to prevent junior lien holders [Widett & Widett] from advancing to a higher priority in and to certain real estate of Snyders by assigning a mortgage through Newbury Prime wherein the said Bornstein et al were involved in another action; 2) that these three Defendants were directors with Myron in Newbury Prime and that Myron breached his fiduciary duty to them in the matter of the assignment of the mortgage to Robert G. Snyder and as a result has emeshed them in this lawsuit; ... [and] ... 4) that Myron, through Inez and personally as a director of Newbury, transferred by mortgage assignment certain assets from the corporation to his son for the purpose of deterring creditors and in so doing has involved these three Defendants as parties in this law suit.

Decision of November 3, 1982 at 3. Finally, Newbury Prime, according to Judge Randall, asserted a cross-claim against the Debtor for:

> 1) breach of his fiduciary duties in the assignment of the [Harbor] mortgage into and through Newbury Prime to Robert G. Snyder without warning Newbury Prime of what he was doing whereby Newbury Prime has been involved in expensive litigation; ... [and] ... 2) for conversion of a City of Boston check to his use.

Decision of November 3, 1982 at 4. Parenthetically, Sidney and Gerald Bornstein, as well as Pearl, Bakis and Newbury Prime, also alleged that the activities of Myron

and Inez in connection with the assignment of the mortgage covering their Brookline home to Newbury Prime and its subsequent assignment by the corporation constituted unfair and deceptive practices in violation of M.G.L. ch. 93A.

### 2. Judge Randall's Findings of Fact

#### a. Breach of Fiduciary Duty

Myron and Inez T. Snyder, Trustees of the Paul G. Roberts Realty Trust, filed a voluntary petition for bankruptcy in 1979.[2] In the fall of 1980, the bankruptcy court ordered the liquidation of the bankruptcy estate which included real property located at 331A–333, 332, 334, 336 and 338 Newbury Street, Boston. An auction sale was advertised.

Bakis learned of the sale and informed Sidney Bornstein, who, like Snyder, was in the meat business. Sidney Bornstein and Bakis attended the auction sale where they met Myron Snyder. Snyder invited them to his home to discuss the value of the Newbury Street property and how it might be acquired. Inez was present at the meeting which took place at the Snyders' home.

During the meeting, Snyder informed Bornstein and Bakis that the bankruptcy court could be persuaded to set aside the auction sale if a higher offer could be produced. According to Judge Randall, an agreement was reached pursuant to which Sidney Bornstein, Gerald Bornstein, Pearl and Bakis would each put up $200,000 to purchase the property. Snyder, in turn, was to attempt to reduce the amounts the Paul G. Roberts Realty Trust would have to pay its creditors. If Snyder could reduce the claims to an amount less than $800,000, he was to get the difference between the reduced amount and $800,000. Inez Snyder was to receive a ten percent interest in a corporation the group would form to take title to the property.

Judge Randall frankly admitted perplexity at how Inez Snyder managed to "insert herself into the picture" and become one of the bidders, as she and Myron were trust-

ees of the Paul G. Roberts Realty Trust, a perplexity this Court shares. Nevertheless, Inez was the successful bidder with a bid of $860,100.

Prior to the submission of the winning bid, however, Snyder approached Sidney Bornstein to advise him that in his opinion an additional $60,100 should be added to the bid. Snyder promised Bornstein that he would reimburse him for the extra $60,-100. Milton Kafka, an attorney who represented Inez and perhaps Myron, then drafted an agreement with respect to the $860,-100 bid.

Pursuant to the terms of the agreement, Newbury Prime Realty Corporation, which was formed on November 1, 1980 and whose charter was issued on November 5, 1980, was to consummate the purchase and sale of the property. The two Bornsteins, Pearl and Bakis each were to be 22.5% stockholders. Inez, as has been indicated, was to be a 10% stockholder. Additionally, the two Bornsteins, Pearl, Bakis and Myron Snyder were to be named corporate directors. Inez was to give the corporation a note for $60,100 to be secured by the pledge of her capital stock.

The closing of the sale of the Newbury Street property commenced on November 5, 1980 at the law offices of Hale & Dorr. Judge Randall characterized it as a "confusing affair" because of its length (two days) and the number of lawyers present. At the closing, Snyder was successful in settling claims against the bankruptcy estate and, accordingly, was paid $23,618. Additionally, Harbor National Bank assigned its mortgage to Newbury Prime. Harbor National Bank had acquired a third mortgage on the Snyders' Dean Road residence in Brookline (in addition to its mortgage on the Newbury Street property) on July 6, 1977. The mortgage was to secure a note from G. Ropate Corp. in the amount of $240,000, as well as the guarantees of the Snyders as trustees of the Paul G. Roberts Realty Trust. At the closing,

---

**2.** The Court takes judicial notice of bankruptcy court records that indicate that the petition under Chapter XI of the Bankruptcy Act was actually filed on June 30, 1978. However, the Debt-

or was adjudicated on October 12, 1979, and a bankruptcy trustee was appointed shortly thereafter.

Newbury Prime assigned the Dean Road mortgage, which it had just received, to Robert G. Snyder. The Harbor National Bank mortgage covering the Newbury Street property was discharged. Sidney Bornstein and Gerald Bornstein signed the assignment instrument as president and treasurer of Newbury Prime respectively, and the assignment was acknowledged and duly recorded. As Judge Randall found:

The Bornsteins did execute this assignment at this very confusing passing, it being among other papers given them to sign. They had no recollection of making an assignment to Robert G. Snyder and received no consideration, therefore, at that time. There was no corporate meeting or directors' meeting of Newbury Prime and no vote of the corporation accepting the assignment of the Harbor mortgage to it, or the assignment out of the Corporation. No information as to this transaction was given to the directors or stockholders of Newbury Prime either by the director Myron Snyder or its stockholder Inez T. Snyder. No consideration of $1.00 or other consideration was paid to Newbury Prime by Inez T. Snyder or anybody else for the assignment on November 5, 1980.

Decision of November 3, 1982 at 18–19.

### b. Interest on the Converted Check

Judge Randall found that Myron Snyder had been collecting rent for the Newbury Street properties once owned by the Paul G. Roberts Realty Trust. Snyder continued to perform this function for Newbury Prime. According to Judge Randall,

[i]n May 1981 a final quarterly rental payment was due. There was some mix-up as to an address, but on or about June 5, 1981, Myron Snyder received a check of $64,203.24 from the city (Exhibit 74) payable to "Myron Snyder and Inez T. Snyder—Trustees of Paul G. Roberts Realty Trust for Newbury Prime". He and Inez T. Snyder then endorsed this check and deposited it into an account in the name of Inez Snyder, 33 Newbury Street, Boston, Massachusetts at the Home Town Co-operative Bank (Exhibit 86). Although asked about the check by Sidney Bornstein, Myron Snyder never told him that he and his wife had it in their possession. When Bornstein discovered this and threatened litigation, the $64,203.24 was then returned on July 2, 1981 but without the interest it had earned while deposited to Inez Snyder's account. Snyder's explanation that the holdup in his collection of this check had to do with non-payment of taxes to the City of Boston is not accepted by the Court.

Decision of November 3, 1982 at 20.

### c. The $60,100 debt

In view of the fact that the Supreme Judicial Court modified Judge Randall's amended judgment by striking the paragraph in which Judge Randall determined that Myron Snyder was personally liable to Sidney Bornstein for $60,100 plus interest from November 5, 1980, and remanded the case for further consideration of Bornstein's claim for $60,100, the Court will consider this issue with reference to Judge Randall's decision on remand.

### 3. Judge Randall's Rulings of Law
### a. Breach of Fiduciary Duty

Judge Randall unequivocally found that Myron Snyder owed a fiduciary duty to Newbury Prime and its directors,[3] and that Snyder breached that duty by failing to divulge the true facts about the mortgage on the Dean Road property. Judge Randall determined that Myron "acted in bad faith," that he and Inez "unscrupulously used Newbury Prime for their own pecuniary purposes," and that "the assignment was passed through Newbury Prime on a deceptive scheme devised by the Snyders to extricate it from their creditors." Decision of November 3, 1982 at 30–31. As a result of Snyder's bad faith, Judge Randall deter-

---

**3.** Judge Randall cited the following cases to establish that a director owes a fiduciary duty to his corporation. *Seder v. Gibbs*, 333 Mass. 445, 453, 131 N.E.2d 376 (1956); *Durfee v. Durfee &* *Canning Inc.*, 323 Mass. 187, 196, 80 N.E.2d 522 (1948); and *Spiegel v. Beacon Participations, Inc.*, 297 Mass. 398, 411, 8 N.E.2d 895 (1937).

mined that Snyder was liable for the damages caused to Newbury Prime and its directors due to their becoming enmeshed in litigation in the following amounts:

| | |
|---|---|
| Bakis | $ 1,800.00 |
| Pearl | $ 600.00 |
| Sidney Bornstein | $ 2,300.00 |
| Newbury Prime | $13,398.45 |

### b. Interest on the Converted Check

Based upon his conclusion that Newbury Prime was entitled to the rent check in the amount of $64,203.24, Judge Randall found that the interest earned on that sum while it was on deposit (i.e., $232.71), which interest was retained by the Snyders, obviously belonged to Newbury Prime.

### B. The August 15, 1984 Decision of the Supreme Judicial Court

#### 1. Background

As noted by Judge Wilkins of the Supreme Judicial Court, Myron and Inez Snyder raised four issues on appeal from Judge Randall's judgment. Two of those issues relate to the claims made by the plaintiffs in this bankruptcy proceeding. In particular, the Snyders challenged Judge Randall's rulings with respect to (i) Myron's liability to Newbury Prime for attorney's fees and to Bornstein and his fellow directors for their lost time in defense of the litigation commenced by Widett & Widett; and (ii) Myron's liability to Sidney Bornstein for $60,100 plus interest.

#### 2. Holding

The Supreme Judicial Court devoted a sizeable portion of its opinion to an analysis of the Harbor National Bank mortgage. The court reiterated Judge Randall's findings with respect to the assignment of that mortgage by the Bank to Newbury Prime followed by Newbury Prime's assignment of the note, guarantee and mortgage on the Dean Road property to Robert G. Snyder, acting as a straw for Inez. The court noted that "[t]he Harbor bank would undoubtedly have discharged the G. Ropate debt to it, instead of assigning it, if the Snyders had wished." *Widett & Widett v. Snyder*, 392 Mass. 778, 783, 467 N.E.2d 1312 (1984) (hereinafter "Decision of August 15, 1984"). Thus, the court concluded that "[t]he only apparent purpose was to maintain the mortgage to the law firm in a position subordinate to the third mortgage. The judge was correct in rejecting such an unfair result and in concluding that the third mortgage was null and void." Decision of August 15, 1984 at 9–10. The Supreme Judicial Court then went on to affirm Judge Randall's conclusion that in failing to disclose the circumstances and purpose of this transaction, Myron violated his fiduciary duty to the corporation. The court stated:

> We agree that the use of Newbury Prime as a mechanism to transfer the Snyders' guarantee and mortgage to the Harbor bank to Robert G. Snyder was a violation of Myron's fiduciary duty as a director of Newbury Prime. See *American Discount Corp. v. Kaitz*, 348 Mass. 706, 711 [206 N.E.2d 156] (1965); *Seder v. Gibbs*, 333 Mass. 445, 452–453 [131 N.E.2d 376] (1956); *Winchell v. Plywood Corp.*, 324 Mass. 171, 177 [85 N.E.2d 313] (1949). The transfers were solely for the Snyders' benefit and were of no benefit to Newbury Prime. Because of the Snyders' use of this device, Newbury Prime became involved in this litigation when the law firm reasonably named Newbury Prime and its directors as defendants in its challenge to the validity of the third mortgage. This involvement of Newbury Prime was a foreseeable consequence of Myron's involvement of it in the assignments. See Restatement (Second) of Torts § 874 (1979).
>
> \* \* \* \* \* \*
>
> The justification for Myron's liability is his bad faith breach of his duty of loyalty to the corporation in failing adequately to disclose his personal interest in the assignments, which were of no benefit to Newbury Prime, and in using the corporation for his family's personal benefit. Myron was properly held liable for the expenses of the litigation as it related to the continuing validity of the mortgage of the Brookline property.

Decision of August 15, 1984 at 10–11.

In a footnote, the court observed that Widett & Widett named Newbury Prime

and the Bornstein group as defendants because they might have claimed the G. Ropate note and the Snyders' mortgage and guarantee as assets of Newbury Prime. Since no such claim was made, the court questioned the allocation of the attorney's fees to the breach of fiduciary duty issue as opposed to Sidney Bornstein's personal claim against Myron. Decision of August 15, 1984 at 11 n. 6. However, Myron Snyder never capitalized on this observation.

With respect to Judge Randall's determination that Snyder owed Bornstein $60,100, the Supreme Judicial Court succinctly observed that "the evidence does not warrant the judge's finding that Sidney paid $60,100 to Myron." Decision of August 15, 1984 at 12. Accordingly, the court remanded the case to Judge Randall for a consideration of Bornstein's claim.

## C. Judge Randall's Decision of August 26, 1985

As Judge Randall noted in his decision, "the sole question to be decided herein is whether or not Sidney Bornstein was owed $60,100 by Myron Snyder." *Widett & Widett v. Snyder*, No. 57964, slip op. at 1 (Suffolk Superior Court August 26, 1985) (hereinafter "Decision of August 26, 1985"). On that issue, Judge Randall found Snyder induced Bornstein to advance an additional $60,100 to assure the acceptance of the bid for the Newbury Street property. Snyder in fact agreed in writing to pay Bornstein the $60,100 personally. According to Judge Randall, "[o]n this representation, Bornstein did advance the additional $60,100 directly to Snyder who used some of this money to compromise certain claims against the Bankruptcy estate." Decision of August 26, 1985 at 4.

Judge Randall found that the agreement drafted by Attorney Kafka just prior to the November 5, 1980 closing, pursuant to which *inter alia* Newbury Prime was established, stock was allocated, and Inez was to pay $60,100 within six months to the new corporation, was a device whereby Snyder's $60,100 debt to Bornstein was transferred to Newbury Prime. Moreover, according to Judge Randall, after the clos-

ing Snyder orally promised to reimburse Bornstein as soon as he received monies from the bankruptcy trustee. Although Myron did receive monies from the bankruptcy trustee, he never paid Bornstein. Judge Randall expressly ruled that Snyder was estopped from denying his debt to Bornstein and that there was never a novation of Snyder's debt.

## III. THE BANKRUPTCY COURT PROCEEDINGS

On March 8, 1989, the Court conducted an evidentiary hearing, at which time Myron Snyder and Sidney Bornstein testified and numerous exhibits were introduced into evidence, including exhibits that were part of the record from the Superior Court proceedings. The testimony of Snyder and Bornstein flushed out a few details but did not *materially* contradict the extensive findings made by Judge Randall in his two decisions. Accordingly, the Court hereby adopts Judge Randall's findings of fact.

Snyder insisted that he did not personally receive the $60,100 from Bornstein. He stated the bankruptcy estate of Paul G. Roberts Realty Trust received the money—a distinction without a difference. However, Snyder admitted that he told Bornstein that he would see to it that the additional $60,100 advanced by Bornstein to secure a winning bid would be returned to him. Snyder also admitted that the Bornstein group and Newbury Prime were sued as a result of the Harbor National Bank mortgage assignment machinations.

With respect to the Debtor's promise to pay Bornstein, a letter dated October 15, 1980 from Snyder to Bornstein was admitted into evidence. This letter provides in relevant part:

> This letter will confirm, with respect to our agreement of which a copy is attached, that I will reimburse you for the cost to you (if any) in excess of $800,000 (rather than $860,100 as written in the attached agreement) with respect to our purchase of the property at 332–338 Newbury Street. To the extent that I fail to do so, within six months from the date of passing, I understand that Inez

T. Snyder will forfeit her 10 percent interest in the property.[4]

Counsel to Bornstein emphasized two additional points in his presentation to the Court: (i) the Debtor's solvency in December 1980, and (ii) the purported inability of Bornstein to vote his 22.5% interest in Newbury Prime so as to effectuate repayment of the $60,100 by Newbury Prime.

With respect to the Debtor's solvency around the time the Debtor promised to repay Bornstein (October/November 1980), counsel to Bornstein relied upon a decision by Judge Lavien dated September 30, 1986. In that opinion, Judge Lavien found that in December 1980, the Debtor's assets totaled $610,000 and his liabilities totaled $367,500. The Debtor admitted that the debt to the Harbor National Bank was not included in the balance sheet formulated by Judge Lavien, and counsel to Bornstein pointed out that the amounts of the liabilities found by Judge Lavien were conservative estimates of the actual obligations owed by the Debtor. More importantly, the Debtor admitted that he could not repay Bornstein except through monies received from the bankruptcy estate of the Paul G. Roberts Realty Trust or from a bank loan.

With respect to Bornstein recovering his money from Newbury Prime, Bornstein testified that all matters involving the corporation required a 70% vote of the shares; that he believed he could not vote his 22.5% interest; that he believed Inez Snyder would vote against any proposed repayment; and, accordingly, that he could not recover his monies from the corporation.

Bornstein also indicated that he approached Snyder about repaying him but Snyder refused, presenting him with the option of buying the stock held in Inez' name for $250,000 instead.

## IV. DISCUSSION

### A. Collateral Estoppel

■ In *Kwiat v. Doucette*, 81 B.R. 184 (D.Mass.1987), the district court thoroughly analyzed the case law involving the use of collateral estoppel in bankruptcy proceedings. It adopted the following standards:

(1) The issue sought to be precluded must be the same as that in a prior action;

(2) The issue must have been actually litigated;

(3) The issue must have been determined by a valid and final judgment; and

(4) The determination must have been essential to the judgment.

81 B.R. at 187 (quoting *In re D'Annolfo*, 54 B.R. 887, 889 (Bankr.D.Mass.1985).

The Court has excerpted segments from the prior state court proceedings and has emphasized the completeness of the findings made by Judge Randall because, in weighing the standards outlined above, the Court is convinced that Myron Snyder is collaterally estopped from relitigating the following issues:

1) his fiduciary relationship to Newbury Prime and it directors under state common law;

2) his breach of that fiduciary duty to Newbury Prime and its directors as a result of the Harbor National Bank mortgage assignments;

3) damage to Newbury Prime and its directors resulting from breach of fiduciary duty; and

4) his debt to Sidney Bornstein in the amount of $60,100.

Despite this conclusion, the Court is also sanguine that the testimony and the exhibits introduced in the adversary proceeding, particularly the October 15, 1980 letter from Snyder to Bornstein, the articles of organization of Newbury Prime that indicate Snyder's status as a director, the deed from Stephen M. Brody, bankruptcy trustee of the Paul G. Roberts Realty Trust to Newbury Prime dated November 5, 1980, and the various assignments of the Harbor National Bank mortgage, amply support the above conclusions. Thus, the issue that remains is whether the debts determined to be due and owing are in fact nondischargeable under the Bankruptcy Code.

---

**4.** The Court notes that no copy of an agreement was attached to the exhibit.

B. Sections 523(a)(2)(A) and 523(a)(4) of the Bankruptcy Code

These sections of the Code provide in relevant part:

(a) A discharge under section 727, 1141, 1228(a), 1228(b) of this title does not discharge an individual debtor from any debt—

(2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by—

(A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtors or an insider's financial condition; ...

(4) for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny;

11 U.S.C. §§ 523(a)(2)(A) and 523(a)(4).

■ The district court in *Kwiat v. Doucette,* 81 B.R. 184 (D.Mass.1987), discussed the burdens of proof under section 523(a)(2)(A) and 523(a)(4), stating "case law is legion that claims for nondischargeability under § 523(a)(2) and for claims of actual fraud or embezzlement under § 523(a)(4) must be proved by clear and convincing evidence." 81 B.R. at 189. However, the district court questioned the propriety of applying the elevated standard to defalcations by fiduciaries since a defalcation may not involve fraud at all, and may simply be the result of negligence or innocent default. *Id.* at 188; *see Central Hanover Bank & Trust Co. v. Herbst,* 93 F.2d 510, 512 (2d Cir.1937). Nevertheless, this Court will apply the clear and convincing standard.

1. Liability under 11 U.S.C. § 523(a)(4)

It is unquestionable that Snyder breached a fiduciary duty to Newbury Prime and its directors, as that duty is defined by state common law, and that the Debtor as the author of the breach owes the plaintiffs the amounts previously indicated.

In *Kwiat v. Doucette,* 81 B.R. 184 (D.Mass.1987), the court summarized the state of the law with respect to who is a fiduciary. It stated:

Federal bankruptcy law controls who is a fiduciary for purposes of § 523(a)(4). To be a fiduciary for dischargeability purposes, the debtor must be a trustee either under an express or "technical" trust. *Davis v. Aetna Acceptance Co.,* 293 U.S. 328, 333, 55 S.Ct. 151, 153, 79 L.Ed. 393 (1934); *3 Collier on Bankruptcy* ¶ 523.14 (1987) (see cases cited therein). The trust relationship must exist prior to the act creating the debt. *Davis,* 293 U.S. at 333–34, 55 S.Ct. at 153–54. State law is relevant in determining whether a trust relationship exists. State statutes may create a particular relationship by expressly imposing fiduciary obligations on a party. *In re Johnson,* 691 F.2d 249, 251–52 (6th Cir. 1982); *In re Romero,* 535 F.2d 618 (10th Cir.1976); *In re Janikowski,* 60 B.R 784 (Bankr.N.D.Ill.1986).

*Kwiat,* 81 B.R. at 188. In Massachusetts, the Supreme Judicial Court has articulated the standard of duty for corporate directors:

The directors of an ordinary business corporation have been called trustees and their relation to the corporation is at least fiduciary. They are bound to act with absolute fidelity and must place their duties to the corporation above every other financial or business obligation. They must act, also, with reasonable intelligence, although they cannot be held responsible for mere errors of judgment or want of prudence. They cannot be permitted to serve two masters whose interests are antagonistic. They are liable if, through their bad faith, financial loss to the corporation results....

*Spiegel v. Beacon Participations, Inc.,* 297 Mass. 398, 410–11, 8 N.E.2d 895 (1937) and case cited therein. *See also Durfee v. Durfee & Canning, Inc.,* 323 Mass. 187, 196, 80 N.E.2d 522 (1948). ("It is settled that the directors of a corporation stand in a fiduciary relationship toward the corporation and that out of that relationship arises a duty of reasonably protecting the interests of the corporation.")

In *Donahue v. Rodd Electrotype Co. of New England, Inc.,* 367 Mass. 578, 328 N.E.2d 505 (1975), the Supreme Judicial

Court noted the fundamental resemblance of close corporations to partnerships because of "the trust and confidence which are essential to this scale and manner of enterprise and the inherent danger to minority interests." 367 Mass. at 592–93, 328 N.E.2d 505. Accordingly, it held that stockholders, whether majority or minority stockholders, "owe one another substantially the same fiduciary duty in the operation of the enterprise that partners owe one another." *Id.* at 593, 328 N.E.2d 505. The court contrasted this "strict good faith standard" with "the less stringent standard of fiduciary duty to which directors and stockholders of all corporations must adhere." *Id.* at 593–94, 328 N.E.2d 505.[5]

▇ Despite this explicit statement of Massachusetts law, federal courts have found that the traditional common law meaning of the term fiduciary is far too broad for bankruptcy purposes. *In re Angelle*, 610 F.2d 1335, 1338–39 (5th Cir.1980); *In re Kelley*, 84 B.R. 225, 229 (Bankr M.D. Fla.1988); *In re Gans*, 75 B.R. 474, 489 (Bankr.S.D.N.Y.1987). Thus, state law, though relevant, is not determinative of the issue of whether Snyder as a director of Newbury Prime is a fiduciary for purposes of section 523(a)(4).

In *In re Decker*, 36 B.R. 452 (D.N.D. 1983), the district court held that "the fiduciary relationship required under 11 U.S.C. § 523(a)(4) includes the fiduciary relationship between a corporate officer or director and the corporation." *Id.* at 458. In that case, the debtor was the president, director, shareholder and principal manager of the plaintiff corporation and was given substantial authority by express or implied consent to operate the corporation. In a series of transactions involving the corporation, the debtor personally benefitted. The court determined that "he, in his fiduciary capacity, had the duty to disclose the personal transactions to the other directors and get their approval before proceeding." 36 B.R. at 456.

In reaching its decision the court relied upon cases decided under the Bankruptcy Act, which contained a provision expressly excepting from discharge debts created by fraud, embezzlement, misappropriation, or defalcation by a debtor while acting as an officer or in any fiduciary capacity. The term officer was construed to include officers of private, as well as public corporations. *Murphy & Robinson Investment Co. v. Cross*, 666 F.2d 873 (5th Cir.1982). Although section 523(a)(4) of the Bankruptcy Code contains no reference to an "officer", that omission, according to *Collier*, is without significance "because an officer who misappropriates funds of a corporation is acting in a fiduciary capacity, and despite the deletion of the word 'officer,' the debt would be nondischargeable." 3 *Collier on Bankruptcy* ¶ 3523.14 at 523–92 n. 1 (15th ed.1989); *see also In re Decker*, 36 B.R. at 456.

The district court in the *Decker* case observed:

Decker cites *Davis v. Aetna Acceptance Co.*, 293 U.S. 328, 333, 55 S.Ct. 151, 153, 79 L.Ed. 393 (1934) for his contention that the fiduciary relationship required under 11 U.S.C. § 523(a)(4) is limited to those fiduciary relationships arising from express and technical trusts. *Davis* is not controlling here. The Supreme Court in *Davis* was interpreting section 17 of the former Bankruptcy Act, which excepted from discharge liabilities created by fraud, embezzlement, misappropriation, or defalcation while acting as an officer or in any fiduciary capacity. 293 U.S. at 333, 55 S.Ct. at 153. Thus, when the Court interpreted the meaning of the term "fiduciary capacity" to require a technical or express trust, rather than a trust implied from a contract, the court did not mean to say that an officer of a corporation was not a fiduciary. In fact, the Supreme Court denied certiorari in a case that applied section 17 of the former Bankruptcy Act to debts of a corporate director or officer acting in violation of

---

5. The Supreme Judicial Court tempered its decision in *Donahue* in *Wilkes v. Springside Nursing Home, Inc.*, 370 Mass. 842, 353 N.E.2d 657 (1976). In that case, it recognized that the con-trolling group of stockholders may have a legitimate business purpose defense in an action alleging breach of strict good faith duty.

his fiduciary obligations. *In re Hammond*, 98 F.2d 703 (2d Cir.), *cert. denied*, 305 U.S. 646, 59 S.Ct. 149, 83 L.Ed. 418 (1938).

*Id.* at 457–58. *See also John P. Maguire & Co. v. Herzog*, 421 F.2d 419 (5th Cir.1970) (managing officer's use of corporate office to obtain a personal benefit at the expense of corporate creditors caused creditors claims to be nondischargeable under section 17(a)(4) of the Act); *In re Bernard*, 87 F.2d 705 (2d Cir.1937) (officer's liabilities created by a known breach of duty to the corporation are not dischargeable); *In re Overmyer*, 52 B.R. 111, 118 (Bankr.S.D.N. Y.1985) ("The liability of corporate officers and directors to the corporation is not dischargeable when bottomed on fiduciary fraud."); *In re Cowley*, 35 B.R. 526 (Bankr. D.Kan.1983) (in an action under section 523(a)(4) a corporate officer is a fiduciary of the corporation); *In re Fussell*, 15 B.R. 1016 (D.Va.1981) (improper application of corporate funds by corporate officer for his personal benefit was a defalcation); 1 Norton, *Bankruptcy Law and Practice* § 27.50 (1981 & Supp.1989) (officers of corporations are fiduciaries to stockholders and the corporation with respect to funds controlled by them). The court in *Decker* relied on the decision in *Pepper v. Litton*, 308 U.S. 295, 60 S.Ct. 238, 84 L.Ed. 281 (1939), in which the Supreme Court considered the power of the bankruptcy court to disallow or to subordinate claims in the exercise of its broad equitable powers. The Supreme Court observed:

> A director is a fiduciary. *Twin–Lick Oil Co. v. Marbury*, 91 U.S. 587, 588 [23 L.Ed. 328 (1875)]. So is a dominant or controlling stockholder or group of stockholders. *Southern Pacific Co. v. Bogert*, 250 U.S. 483, 492 [39 S.Ct. 533, 537, 63 L.Ed. 1099 (1919)]. Their powers are powers in trust. See *Jackson v. Ludeling*, 21 Wall. 616, 624 [88 U.S. 616, 22 L.Ed. 492 (1874)]. Their dealings with the corporation are subjected to rigorous scrutiny and where any of their contracts or engagements with the corporation is challenged the burden is on the director or stockholder not only to prove the good faith of the transaction but also to show

> its inherent fairness from the viewpoint of the corporation and those interested therein. *Geddes v. Anaconda Copper Mining Co.*, 254 U.S. 590, 599 [41 S.Ct. 209, 212, 65 L.Ed. 425 (1921)].

308 U.S. at 306, 60 S.Ct. at 245.

The *Decker* court also relied upon *In re Hammond*, 98 F.2d 703 (2nd Cir.), *cert. denied*, 305 U.S. 646, 59 S.Ct. 149, 83 L.Ed. 418 (1938). The Court is impressed by the fact that the Court of Appeals for the Second Circuit in *Hammond* was aware of and indeed cited the *Davis* case in its opinion. Moreover, the facts in the *Hammond* case are instructive.

In *Hammond*, the Debtor sought to restrain a judgment creditor, Acoustic Products, from taking any further steps to collect its judgment. The judgment in question was rendered in a suit in equity to compel the debtor and other defendants to account for profits alleged to have been made in violation of their duties as directors of Acoustic. The directors of Acoustic had accepted an offer to participate in the purchase of stock. When the time came to purchase the stock, Acoustic lacked the funds necessary to do so. However, the directors, the debtor among them, made the required payments and took the stock in their own names. Eventually, the directors made large profits from the sale of their shares. The court that rendered the judgment in favor of Acoustic imposed liability on the debtor and the other directors on the theory that a fiduciary cannot profit from a violation of his duty to his cestui or violate the rigid rule of undivided loyalty to the corporation.

The Court of Appeals for the Second Circuit, in finding the judgment nondischargeable, stated:

> The liability upon which the judgment is based is obviously one created while Hammond was acting as an officer or in a fiduciary capacity. The president of a private corporation has been held to be an "officer" or a fiduciary within the meaning of the clause under discussion. It can scarcely be doubted, and is not, we understand, disputed, that a director falls within the same category. Whether

Hammond's liability was created by "fraud" within the meaning of the fourth subdivision of section 17 is a question much disputed by the parties; but this also need not be decided because in any event it was created by his "misappropriation" while acting as an officer or in a fiduciary capacity. As the interlocutory decree adjudged, the conduct of Hammond and his associates was an "unlawful taking and disposition" of Acoustic's property and property rights. Whether the property so taken be deemed the corporate contract, or the stock covered by the contract, or the proceeds of the sale of such stock; it was a res held in trust for the corporation by a person who was already a fiduciary; for the fiduciary to claim it as his own was a "mispropriation" within the ordinary meaning of that word.

98 F.2d at 705 (citations omitted).

In a recent case, *In re Twitchell*, 91 B.R. 961, 965 (D. Utah 1988) the United States District Court for the District of Utah criticized several of the foregoing cases, noting "[t]hese cases construe the term fiduciary capacity very broadly, requiring only that a fiduciary relationship exist between an officer and his corporation." The court, referring to *Davis v. Aetna Acceptance Co.*, 293 U.S. 328, 55 S.Ct. 151, 79 L.Ed. 393 (1934), went on to state that "such a broad construction runs contrary to the stated judicial construction of 'fiduciary capacity' by the Supreme Court." *In re Twitchell*, 91 B.R. at 965. *See also In re Stone*, 91 B.R. 589 (D. Utah 1988). Accordingly, the court reversed the bankruptcy court's determination that a debt owed by the president and treasurer of a credit union for *inter alia* failure to apply proceeds from the sale of his home to satisfy a loan obligation was nondischargeable. The district court ruled there was insufficient evidence from which to find an express trust and the creditor was unable to identify an express legislative intent to create a trust in the Utah code. 91 B.R. at 966.

This Court agrees with the court in *Twitchell* to a limited extent. It seems clear that some courts seem to be overlooking or distinguishing the requirement of an express or technical trust set forth in a line of Supreme Court cases, beginning with *Chapman v. Forsyth*, 43 U.S. 202, 11 L.Ed. 236 (1844), in which the court held that a factor entrusted with selling goods for another was not a fiduciary. Nevertheless, the court in *Twitchell* did not mention, let alone distinguish, the Supreme Court's ruling in *Pepper v. Litton*, 308 U.S. 295, 60 S.Ct. 238, 84 L.Ed. 281 (1939), and made no attempt to harmonize *Davis* with the line of cases that include *In re Hammond*, 98 F.2d 703 (2d Cir.), *cert denied*, 305 U.S. 646, 59 S.Ct. 149, 83 L.Ed. 418 (1938).

The problem raised by the cases is not obviated by holding Snyder to the fiduciary standards imposed on partners something the Court could do in view of the fact that Newbury Prime is a close corporation, *see Donahue v. Rodd Electrotype Co. of New England, Inc.*, 367 Mass. at 593, 328 N.E.2d 505, since the conclusion of a number of federal courts is that partners are not fiduciaries for purposes of section 523(a)(4). *In re Kelley*, 84 B.R. 225 (Bankr.M.D.Fla.1988); *In re Napoli*, 82 B.R. 378 (E.D.Pa.1988); *see generally* 3 *Collier on Bankruptcy*, ¶ 523.14[1][c] at 523–96–98 (15th ed. 1989). However, one court has taken exception to the emphasis on express or technical trusts with respect to partnerships, stating:

> Such a narrow interpretation of this Section would eliminate relationships which traditionally have been recognized to be fiduciary even though they are not created by an express or technical trust. For instance, it cannot be gainsaid that the relationship between an attorney and a client is not fiduciary in nature; neither is a relationship between corporate officers and stockholders of a corporation. Clearly, Congress did not intend to exclude debts arising from breach of the duty arising out of such relationships from the reach of § 523(a)(4).

*In re Cramer*, 93 B.R. 764, 767–68 (Bankr. M.D.Fla.1988). Based upon that rational and Florida common law, the court concluded that partners owe a fiduciary duty to one another which is within the contemplation of section 523(a)(4), a position at odds

with decisions rendered by other Florida bankruptcy judges. *See In re Ryan*, 90 B.R. 554 (Bankr.S.D.Fla.1988); *In re Kelley*, 84 B.R. 225 (Bankr.M.D.Fla.1988); *In re Elliott*, 66 B.R. 466 (Bankr.S.D.Fla. 1986). *See also In re Ragsdale*, 780 F.2d 794 (9th Cir.1986) (California law).

Thus, the Court is confronted with with an interesting conundrum. If the Court utilizes the elevated partnership standard applicable to officers and directors of close corporations, Snyder's debts, at least according to one line of cases, are dischargeable. However, if the Court follows the majority rulings and utilizes the standards normally applicable to corporate officers and directors, Snyder's debts to his fellow directors and to Newbury Prime are non-dischargeable.

 Although the Court is not convinced that Massachusetts law makes corporate officers and directors, trustees of express or technical trusts per se (since to do so would seem to eliminate the obvious distinctions between corporations and trusts), the Court believes that their fiduciary duty to the corporation and other directors precedes the creation of any debt. Moreover, the Court is inclined to harmonize the line of cases that invariably mention *In re Bernard*, 87 F.2d 705 (2d Cir.1937), and *In re Hammond*, 98 F.2d 703 (2nd Cir.), *cert. denied*, 305 U.S. 646, 59 S.Ct. 149, 83 L.Ed. 418 (1938), with the requirement of *Davis v. Aetna Acceptance Co.*, 293 U.S. 328, 55 S.Ct. 151, 79 L.Ed. 393 (1934), that section 17(4) of the Bankruptcy Act, 11 U.S.C. § 35, only applies to technical trusts. Thus, the Court agrees with the court *In re Decker*, 36 B.R. 452, 457–58 (Bankr.D.N.D.1983) and finds the operative language in *Davis* for corporate directors to be, not the requirement of a technical trust, but the requirement that section 17(4) only applies " 'to a debt created by a person who was already a fiduciary when the debt was created.' " 293 U.S. at 333, 55 S.Ct. at 154. In reaching this decision the Court is influenced by the rule of *Midlantic National Bank v. New Jersey Department of Environmental Protection*, 474 U.S. 494, 106 S.Ct. 755, 88 L.Ed.2d 859 (1986), "that bankruptcy statutes will not be deemed to have changed pre-Code law

unless there is some indication that Congress thought that it was effecting such a change." *United States v. Ron Pair Enterprises, Inc.*, —— U.S. ——, 109 S.Ct. 1026, 1036, 103 L.Ed.2d 290 (1989). *See also Kelly v. Robinson*, 479 U.S. 36, 50–51, 107 S.Ct. 353, 361–62, 93 L.Ed.2d 216 (1986). Since there is no indication of a congressional intent to change pre-Code law, the Court is convinced that *Decker* rather than *Twitchell* sets forth the better view. Additionally, the fact that the Supreme Court denied certiorari in *Hammond* is not without significance. Thus, to summarize, the Court finds that the fiduciary duties of corporate directors under Massachusetts law satisfy the requirements of section 523(a)(4) of the Bankruptcy Code. Snyder breached that fiduciary duty to Newbury Prime and its directors. His actions in having the Harbor National mortgage assigned by Newbury Prime to his son was a misappropriation. At the time the mortgage was assigned to Robert G. Snyder it was at least arguably a corporate asset. Snyder's actions thus constituted an unlawful taking and disposition of Newbury Prime's property for his personal benefit and that of his family. The same can be said for Snyder's actions with respect to the rent check from the City of Boston. Thus, Snyder is liable for the damages arising from the breach of his fiduciary duty to Newbury Prime and its directors, and those damages are nondischargeable debts for purposes of section 523(a)(4).

2. Liability under 11 U.S.C. § 523(a)(2)(A)

 To prevail under section 523(a)(2)(A) clear and convincing evidence must establish that Snyder obtained $60,100 from Bornstein by means of false representations, false pretenses or actual fraud. In this instance, the Debtor unequivocally promised to repay Bornstein on two occasions. Bornstein, however, must be able to show by inference or otherwise that at the time the Debtor made the initial promise he knew it was false, and that he had no intention of repaying Bornstein. Bornstein also must establish that the false representations involve moral turpitude or intention-

al wrong and that he relied on Snyder's promise. *See In re Jackson*, 89 B.R. 308 (Bankr.D.Mass.1988); *In re Turner*, 23 B.R. 681 (Bankr.D.Mass.1982).

Bornstein clearly has established that he relied on Snyder's promises. However, the question of the Debtor's intent which "must almost always be inferred from the totality of circumstances," *In re Roberts*, 82 B.R. 179, 184 (Bankr.D.Mass.1987), is more problematical. There is no question that at the times Snyder promised to repay Bornstein (i.e., on October 15, 1980 and after the closing on November 6, 1980) his financial condition was perilous. Moreover, there is no question that Snyder is a sophisticated businessman capable of showing ingenuity and brashness in the conduct of his business. Nevertheless, Snyder anticipated obtaining funds from the trustee of the bankrupt Paul G. Roberts Realty Trust at the time he first asked Bornstein for the money. In fact, Judge Randall found, and the Debtor admitted in this Court, that he or Inez did receive approximately $59,000 from the Trustee sometime after the closing. Thus, the Court would have to find that the Debtor had no intention of making those funds available to Bornstein at the time he received the advance from him. The timing is critical, since any subsequent decision by the Debtor not to repay Bornstein from funds received from the bankruptcy estate, while relevant to his moral character, is not relevant to a determination of nondischargeability pursuant to section 523(a)(2)(A).

For this Court to make a determination that the $60,100 debt is nondischargeable, the Court would have to be convinced by clear and convincing evidence that at the time the Debtor approached Bornstein about raising the bid for the Newbury Street properties, he anticipated receiving directly or through Inez money from the estate that he intended to retain, or that he had already devised a ruse whereby he could convert his personal obligation to a corporate one. It seems clear to the Court that if Snyder did conceive of such a scheme the conception of it did not occur until around the time of the November 5, 1980 closing, *after* Bornstein had advanced the money to him. Thus, the Court finds that Bornstein has failed to carry his burden of proof on the issue of the dischargeability of the debt. Accordingly, Snyder's debt to Bornstein is dischargeable. The decision is a difficult one because the Court recognizes the egregiousness of the Debtor's conduct in manipulating both the bankruptcy sale of the assets of the Paul G Roberts Realty Trust and the Harbor National Bank mortgage assignments.

## V. CONCLUSION

In view of the foregoing, the Court hereby enters judgment in favor of Myron Snyder and against Sidney Bornstein with respect to the $60,100 debt. The Court enters judgment against Myron Snyder and in favor of Sidney Bornstein in the amount of $2,300; in favor of Philip Pearl in the amount of $600; in favor of Peter Bakis in the amount of $1,800; and in favor of Newbury Prime in the amount of $13,781.16.